1

CHRISTOPHER M. MCDERMOTT (SBN 253411)
cmcdermott@piteduncan.com

2

TODD S. GARAN (CA SBN 236878)
tgaran@piteduncan.com

3

**PITE DUNCAN, LLP**
4375 Jutland Dr., Ste. 200

4

P.O. Box 19734
San Diego, CA 92177-9734

5

Telephone: (858) 750-7600
Facsimile:  (619) 590-1385

6

7

Attorneys for: JP Morgan Chase Bank, N.A.
("**Creditor**")

8

9

### UNITED STATES BANKRUPTCY COURT

10

### CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

11

In re

1:11-bk-18591-VK

12

NOOR NORRIS and HELY NORRIS,

Chapter 11

13

Debtor and Debtor in Possession,

**OBJECTION TO DEBTORS'
DISCLOSURE STATEMENT**

14

[***Docket Number 270***]

15

S̲U̲B̲J̲E̲C̲T̲ P̲R̲O̲P̲E̲R̲T̲Y̲:
20358 Via Sansovino,

16

Northridge, CA 91326

17

Date:      November 6, 2014

18

Time:      1:00 p.m.
Rm:        301

19

           21041 Burbank Blvd.
           Woodland Hills, CA 91364

20

Judge:     Hon. Victoria S. Kaufman

21

22

JP Morgan Chase Bank, N.A.[1] ("**Creditor**"), secured creditor of the above-entitled

23

Debtors, Noor Norris and Hely Norris ("**Debtors**") hereby submits its Objection ("**Objection**")

24

to Debtors' Chapter 11 Disclosure Statement.  The basis of the Objection is stated below:

25

/./././

26

/./././

27

28

[1] This Objection shall not constitute a waiver of the within party's right to receive service pursuant to Fed. R. Civ. P. 4, made applicable to this proceeding by Fed. R. Bankr. P. 7004, notwithstanding Pite Duncan, LLP's participation in this proceeding. Moreover, the within party does not authorize Pite Duncan, LLP, either expressly or impliedly through Pite Duncan, LLP's participation in this proceeding, to act as its agent for purposes of service under Fed. R. Bankr. P. 7004.

# I. **STATEMENT OF FACTS**

***Creditor's Claim:***

The Loan is evidenced by a promissory note dated July 26, 2007, executed Debtor to Washington Mutual Bank, FA ("**WAMU**") in the principal sum of $430,000.00 (the "**Note**"). A copy of the Note is attached hereto as **Exhibit A** and incorporated herein by reference.

The Note is secured by a 2nd Deed of Trust (the "**Deed of Trust**") granting WAMU a security interest in the Subject Property, which is more fully described in the Deed of Trust. The Deed of Trust was duly recorded on August 8, 2007, in the official records of the Los Angeles County Recorder's office, State of California as Document Number 20072017562. A copy of the Deed of Trust is attached hereto as **Exhibit B** and incorporated herein by reference. The Note and Deed of Trust may be referred to collectively herein as the "**Loan**."

On or about September 25, 2008, WAMU was closed by the Office of Thrift Supervision and the FDIC was named receiver. Pursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver of WAMU and JP Morgan Chase Bank (e.g. "**Creditor**") dated September 25, 2008, Creditor acquired certain assets, including all loans and all loan commitments of WAMU. As a result, Creditor became the owner of the loans and loan commitments of WAMU as a matter of law.[2]

***The Bankruptcy Proceedings:***

On or about July 18, 2011, Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Central District of California-San Fernando Valley Division and were assigned bankruptcy case no. 1:11-bk-18591-VK.

---

[2] The FDIC, as receiver, "steps into the shoes of [WAMU], and operates as its successor….The FDIC then as the broad powers to allocate assets and liabilities, such as through a Purchase and Assumption Agreement." See, 12 U.S.C. §§1811-1832(d); *Miller v. Cal.Reconveyance Co*., No.10-cv-421, 2010 WL 2889103 *2 (S.D.Cal. July 22, 2010); *Resolution Trust Corp. v. S&K Chevorlet* Co, 923 F.Supp. 135 (C.D. Ill. 1996) (discussing how transfer of assets by the FDIC as receiver occurs by operation of law and that such power preempts state law with respect to such assignments). The Purchase and Assumption Agreement is a matter of public record and available on the FDIC's website at http://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf. The P&A is undisputed and the Court may take Judicial Notice of the Agreement. *See, Hintz v. JP Morgan Chase Bank*, Civ.No.10-119, 2010 WL 422048, *3 (D. Minn. Oct. 20, 2010); White v. Chase Bank USA, N.A., No.3:10-cv-21, 2010 WL 3782399, *1n.1 (S.D.Ohio, Sept.28, 2010).

**OBJECTION TO APPROVAL OF DEBTORS' DISCLOSURE STATEMENT**

1    According to Debtors' Bankruptcy Petition and Schedules on file in this matter, the

2    Subject Property has been identified as their principal residence. *See, Docket Numbers 1 and 14*.

3    [3]

4    On or about April 12, 2012, Creditor filed a Proof of Claim in the Debtors' bankruptcy

5    case. A copy of Creditor's Proof of Claim may be found with this Court's Claims Register as

6    Claim Number 11.

7    On or about August 26, 2014, Debtors filed their Fourth Amended Chapter 11 Disclosure

8    Statement and Plan of Reorganization ("**Plan**"). *See, Docket Numbers 271 and 270,*

9    *respectively*. In the Debtors' Plan, Creditor's Claim is identified as a Class 2(c) Secured Claim

10   on Debtors' principal residence, but it is deemed wholly unsecured. *See, Plan.* While the Plan

11   asserts the value of the Subject Property is $995,000.00, no appraisal report is attached to

12   Debtor's Disclosure Statement or Plan.

13   ## II. <u>ARGUMENT</u>

14   **A.    <u>THE DEBTOR'S DISCLOSURE STATEMENT FAILS TO CONTAIN</u>**

15   **<u>ADEQUATE INFORMATION IN VIOLATION OF SECTION 1125 OF THE</u>**
     **<u>BANKRUPTCY CODE.</u>**

16   **1. <u>Legal Standard</u>**

17   Title 11 U.S.C. § 1125(b) provides that acceptance or rejection of a proposed Plan of

18   reorganization may not be solicited unless the holder of a claim or interest to whom the

19   solicitation is made is provided with the proposed plan or summary thereof and "a written

20   disclosure statement approved, after notice and a hearing, by the court as containing adequate

21   information." 11 U.S.C. §1125(b). To approve a Disclosure Statement, the court must first

22   determine that it contains "adequate information." *In re Unichem Corp.*, 72 B.R. 95, 96 (Bankr.

23   N.D. Ill. 1987).

24   Adequate information means that the Disclosure Statement must clearly and succinctly

25   inform the average creditor "what it is going to get, when it is going to get it, and what

26

27   [3] Pursuant to Rules 201(b) and 201(d) of the Federal Rules of Evidence, which are made applicable to this
     proceeding by Rule 9017 of Federal Rules of Bankruptcy Procedure, Creditor requests that the court take judicial
     notice of the documents and pleadings that are on file and part of the record in the instant case. The information

28   contained in Debtors' Petition and Schedules is signed under penalty of perjury and is admissible as an admission of
     Debtors pursuant to Federal Rules of Evidence, Rule 801(d).

1  contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.

2  N.H. 1991). "Adequate information" is information of a kind, and in sufficient detail, to enable a

3  "hypothetical investor" typical of the holders of claims and interests in a case to make an

4  informed judgment about the Plan.  11 U.S.C. § 1125(a)(1).

5       Relevant factors in evaluating the adequacy of a Disclosure Statement include: (1) the

6  events which led to the filing of the bankruptcy petition; (2) a description of the available assets

7  and their value; (3) the anticipated future of the company; (4) the source of the information

8  contained in the Disclosure Statement; (5) a disclaimer; (6) the present condition of the debtor

9  while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors in a Chapter 7

10  liquidation; (9) the accounting method utilized to produce financial information and the name of

11  the accountants responsible for such information; (10) the future management of the debtor; (11)

12  the Chapter 11 Plan or a summary thereof; (12) the estimated administrative expense, including

13  attorneys' and accountants' fees; (13) the collectability of accounts receivables; (14) financial

14  information, data, valuations or projections relevant to the creditors' decision to accept or reject

15  the Chapter 11 Plan; (15) information relevant to the risks posed to creditors under the Plan; (16)

16  the actual or projected realizable value from recovery of preferential or otherwise voidable

17  transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the

18  debtor; and (19) the relationship of the debtor with affiliates.  *In re Metrocraft Publishing*

19  *Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).

20       Debtors' Disclosure Statement does not provide sufficient information in compliance with

21  §1125 as set forth below.

22      **2.  Debtors' Disclosure Statement/Plan Fail to Provide Sufficient Information**
23          **Regarding Treatment of Creditor's Claim**.

24       A Disclosure Statement does not provide sufficient information if it does not accurately

25  describe the plan, which must generally be supported by sufficient factual basis.  *See, In re*

26  *Civitella*, 15 B.R. 206, 208 (BC ED PA 1981); *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973,

27  981 (BC ND NY 1988); *In re Dakota Rail, Inc.*, 104 B.R. 138, 149 (BC D MN 1989).

28

As discussed above, Creditor's claim is identified as a claim secured by a junior deed of trust against the Subject Property, which is Debtors' principal residence.  As such, Creditor's claim is protected by the anti-modification provisions of 11 U.S.C. §1123(b)(5).  The Disclosure Statement and Plan make the assertion that the value of the Subject Property is $995,000.00, based upon an appraisal, and that Creditor's claim is wholly unsecured.  *See, Plan,Pg.6.* Debtors; however, have not filed a Motion to Value the Subject Property, nor have Debtors provided any evidence to support their valuation of the Subject Property.

The first Deed of Trust Holder, Deutsche Bank National Trust Company, filed a Proof of Claim in the amount of $1,047,997.31.  *See, Claim No.14*.  Creditor disputes Debtors' valuation. According to Certified Real Estate appraiser Jonathan Goldrich, the market value of the Subject Property is $1,350,000.00.  Attached hereto as **Exhibit C** is Mr. Goldrich's Declaration and appraisal report for the Subject Property attached thereto.  Thus, Creditor's claim would appear to be secured based upon its valuation of the Property.

As such, the Debtor's Disclosure Statement fails to provide adequate information and approval of Debtor's Disclosure Statement should be denied, or the Disclosure Statement and Plan amended to cure this defects.

**B.**    **THE APPROVAL OF DEBTOR'S DISCLOSURE STATEMENT MUST BE DENIED AS THE DEBTOR'S PLAN WOULD BE PATENTLY UNCONFIRMABLE**

**1.**    **Legal Standard**

The Court may refuse to permit solicitation of plan acceptances if, based on the proposed disclosure statement, it were to determine that the proposed Plan violates applicable provisions of the Bankruptcy Code.  *In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re Main Street AC, Inc.,* 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999). "If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986); *see also, In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (disapproval of the adequacy of a disclosure statement may be appropriate "where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible."). 11 U.S.C. §

1   1129(a)(1) provides that a court shall confirm a plan only if it complies with the applicable

2   provisions of the bankruptcy code. 11 U.S.C. § 1129(a)(1) [emphasis added].   In order for a plan

3   to be confirmed, the plan proponent bears the burden of proof with respect to each and every

4   element of Bankruptcy Code § 1129(a).    Further, 11 U.S.C. §1123(a) sets forth certain

5   mandatory provisions that must be set forth in a Chapter 11 Plan.

6

7   **2        The Debtors' Disclosure Statement and Plan Seek to Motion a Claim In Violation of the Anti-Modification Provisions of § 1123(b)(5) and Debtors Fail To Provide Sufficient Evidence Regarding The Value of Subject Property and That Creditor's Claim is Wholly Unsecured.**

8

9

10   11 U.S.C. §1123(b)(5) provides that a plan may modify the rights of holders of secured

11   claims, *other than a claim secured only by a security interest in real property that is the debtor's*

12   *principal residence.* 11 U.S.C. §§101(13A); 1123(b)(5). [emphasis added]. 11 U.S.C.

13   §101(13)(A) states that a "debtor's principal residence…means a residential structure including

14   incidental property, without regard to whether that structure is attached to real property…." See,

15   11 U.S.C. §101(13)(A).   Further, "incidental property" means "property commonly conveyed

16   with a principal residence area where real property is located…." See, 11 U.S.C. §101(27B)(A).

17   In determining when particular property is deemed a debtor's principal residence and

18   subject to the anti-modification provisions of 1123(b)(5), a majority of the courts consider

19   whether the property was the debtor's principal residence at the time the debtor filed the

20   bankruptcy petition. *See, In re Wages*, 508 B.R. 161, 164 (9th Cir. BAP (ID) 2014);   *In Re*

21   *Salahaldin Abdelgadir (In Re Abdelgadir)*, 455 B.R. 896 (9th Cir. BAP (Nev.); *In re Jordan*, 330

22   B.R. 857, 860 (M.D. Ga. 2005); *In re Baker* 398 B.R. 198, 202 (N.D. OH 2008) (citing *In re*

23   *Howard*); *In re Howard*, 220 B.R. 716, 718 (S.D. Ga 1998); *In re Lebrun*, 185 B.R. 665, 666

24   (B.C. D. Mass. 1995); *In re Wetherbee*, 164 B.R. 212, 215 (D. N.H. 1994); *In re Dinsmore*, 141

25   B.R. 499 (B.C W.D. Mich. 1992); *In re Amerson*, 143 B.R. 413,416 (B.C. S.D. Miss. 1992).

26   In the instant case, Debtors' Bankruptcy Petition, Schedules and Plan acknowledge the

27   Subject Property is their principal residence.  Accordingly, Creditor's claim is subject to the anti-

28

1  modification provision found in 11 U.S.C. § 1123(b)(5).  Despite this; however, Debtors' Plan is

2  expressly seeking to modify Creditor's claim and treat Creditor's claim as wholly unsecured.

3      11 U.S.C. § 506(a)(1) provides that an allowed claim of a creditor secured by a lien on

4  property in which the estate has an interest…is a secured claim to the extent of the value of such

5  creditor's interest in the estate's interest in such property.  The Bankruptcy Code does not

6  specify the appropriate date to use in valuing collateral, but Section 506(a)(1) instead provides:

7
8      "…*Such value shall be determined in light of the purpose of the valuation and of
   the proposed disposition or use of such property, and in conjunction with any
   hearing on such disposition or use or on a plan affecting such creditor's interest*"

9
10  §506(a)(1) (emphasis added). [4]

11      Congress envisioned a flexible approach to valuation whereby bankruptcy courts would

12  choose the standard that best fits the circumstances and that considered the proposed disposition

13  or use of the collateral is of paramount importance to the valuation.  *In re SW Boston Hotel*

14  *Venture, LLC*, 2014 WL 1399418, pg. 8 (1st Cir); *In re Heritage Highgate, Inc.*, 679 F.3d 132,

15  141 (3rd Cir. 2012) (citing to *Associates Commercial Corp. v. Rash*, 520 U.S. 953 at 962, 117

16  S.Ct. 1879, 138 L.Ed.2d 148 (1997)); *In re Cahill*, 503 B.R. 535, 540 (Bankr. D.N.H 2013).

17  Indeed, courts have long recognized the value of real property securing a claim, and by

18  implication, the amount of the secured claim, can change throughout the course of a bankruptcy

19  proceeding.  See, *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed2d 903 (1992); *In re*

20  *Ahlers*, 794 F.2d 388, 398 (8th Cir. 1986), rev'd on other grounds, 485 U.S. 197 (1988) (In

21  determining feasibility of a chapter 11 plan, value of collateral is determined at time for

22  confirmation of the plan, and the initial valuation for adequate protection purposes is not *res*

23  *judicata* in determining value of collateral or secured claim); *In re SW Boston Hotel Venture,*

24  *LLC*, 2014 WL 1399418, pg. 11 (1st Cir) (Valuation for one purposes at one point in bankruptcy

25  proceeding has no binding effect on valuations performed at other points in proceeding);

26
   ───────────────

27  [4] As the legislative history of §506(a) indicates, "…courts will have to determine value on a case-by-case basis, the
   subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed
28  disposition or use of property or on a plan affecting a creditor's interest.  To illustrate, a valuation early in the case
   in a proceeding under sections 361-363 *would not be binding upon the debtor or creditor at the time of confirmation
   of the plan.*" Sen.R No.989, 95th Cong.,2d Sess. 68 (1978).

1   *Fairchild v. Leganon Prod. Credit Ass'n (In re Fairchild)*, 31 B.R. 789 (Bankr. S.D. OH

2   1983)(A determination of the amount of a secured claim in one aspect of a bankruptcy

3   proceeding is not necessarily *res judicata* in other aspects of that proceeding).

4       In light of this flexibility, a majority of the courts agree that for the purpose of

5   determining the amount of a secured creditor's claim in the context of a plan, the collateral

6   should be valued as of effective date of the plan.    *See, In re Ahlers*, 794 F.2d 388, 398 (8th Cir.

7   1986), rev'd on other grounds, 485 U.S. 197 (1988) (For purpose of the reorganization plan, the

8   value of the collateral is to be determined on the date of the confirmation hearing, or valuation

9   hearing; *In re Heritage Highgate, Inc.*, 679 F.3d 132, 142-143 (3rd Cir. 2012) (Where purpose of

10  the valuation of collateral is to determine the treatment of a claim by reorganization plan as

11  secured or unsecured, the values determined must be compatible with the values that will prevail

12  on the plan's confirmation date); *In re Dheming*, 2013 WL 1195652 (Bankr. N.D. Cal) (The

13  plain language of §506(a) supports the conclusion that when the purpose of the valuation is to

14  determine the treatment of a creditor's secured claim under a plan, and the debtor intends to

15  retain the collateral, the value should be set as of the date of confirmation of that plan); *In re

16  Eblen*, 1991 WL 284108, at 2 (Bankr. N.D. Cal. 1991) (The correct rule is that valuation of a

17  secured claim for purposes of a Chapter 11 Plan should occur at the time of the confirmation of

18  the Plan); *In re Hales*, 493 B.R. 861, 866 (Bankr. D. Utah 2013) (Chapter 11 plan confirmation

19  date was appropriate date for determining value of commercial real estate that debtors proposed

20  to retain in "cramdown" plan that stripped down liens of creditor whose claims were secured by

21  this realty); *In re Cahill*, 503 B.R. 535, 540 (Bankr. D.N.H 2013) (In deciding whether

22  residential mortgaged property had value in excess of amount of senior mortgage debt, such that

23  there was at least some equity to support junior mortgagee's lien…bankruptcy court would

24  employ valuation date close in time to confirmation, in order to give junior mortgagee, which

25  bore the risk of having extended creditor to debtors, the benefit of any post-petition increase in

26  value of property, which was allegedly due to improvement in real estate market rather than

27  actions of debtor); *In re Stanley*, 185 B.R. 417,  (Bankr. D. Conn. 1995) (if purpose of claim

28  valuation is to determine treatment of claim by plan, value determined at the hearing must be

1  compatible with the value that will prevail at confirmation); *In re Seip*,116 B.R. 709, 710 (Bankr.

2  D. Neb 1990) (Amount of secured claim for purposes of plan of reorganization is to be

3  determined by value of collateral on date in close proximity to date of confirmation of plan, and

4  not on date Chapter 11 case was commenced).

5        The first Deed of Trust Holder, Deutsche Bank National Trust Company, filed a Proof of

6  Claim in the amount of $1,047,997.31.  *See, Claim No.14*.  Creditor disputes Debtors' valuation.

7  According to Certified Real Estate appraiser Jonathan Goldrich, the market value of the Subject

8  Property is $1,350,000.00.  Attached hereto as **Exhibit C** is Mr. Goldrich's Declaration and

9  appraisal report for the Subject Property.  Thus, Creditor's claim would appear to be secured

10  based upon its valuation of the Property.

11        Debtors' Status Report acknowledges that Creditor likely has a secured claim and states

12  that Debtors' counsel will be reaching out to Creditor in an effort to resolve the treatment of its

13  claim.  *See, Docket Number 272*.  Counsel for Creditor has attempted to contact Debtors' counsel

14  several times in an attempt to try and resolve the matter, but has not received a response to date.

15  Thus, Creditor filed the instant Objection to preserve its rights and move the discussion forward.

16        Consequently, Creditor believes Debtors' Plan would be patently unconfirmable in its

17  current form, and Creditor requests that approval of Debtors' Disclosure Statement be denied, or

18  Debtors be required to amend the Disclosure Statement to remedy the defects noted herein.

19  /././

20  /././

21  /././

22  /././

23  /././

24  /././

25  /././

26  /././

27  /././

28  /././

**OBJECTION TO APPROVAL OF DEBTORS' DISCLOSURE STATEMENT**

/././

## III.    <u>CONCLUSION</u>

For all the foregoing reasons, the approval of the Debtors' Disclosure Statement must be denied.

WHEREFORE, Creditor respectfully requests:

    1.    That approval of the Debtors' Disclosure Statement be denied;

    2.    That Debtors be required to amend the Disclosure Statement to address Creditor's foregoing concerns; and

    3.    For such other and further relief as this Court deems just and proper.

Respectfully submitted,

PITE DUNCAN, LLP

Dated: October 22, 2014

/s/ *Todd S. Garan* (CA SBN 236878)
TODD S. GARAN
Attorneys for Creditor

.

**OBJECTION TO APPROVAL OF DEBTORS' DISCLOSURE STATEMENT**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, CA 92177-0933

A true and correct copy of the foregoing document entitled (*specify*): <u>Objection to Debtors' Disclosure Statement</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>October 23, 2014</u>    I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Debtor's Attorney:** Dennis E Mcgoldrick  dmcgoldricklaw@yahoo.com
**U.S. Trustee:**  ustpregion16.wh.ecf@usdoj.gov
**U.S. Trustee Attorney:** Russell Clementson russell.clementson@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) <u>October 23, 2014</u>    I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Noor Norris
Hely Norris
20358 VIA SANSOVINO
NORTHRIDGE, CA 91326

Honorable Victoria S. Kaufman
Central District of California - San Fernando Valley Division
21041 Burbank Blvd,
Woodland Hills, CA 91367-6606

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| October 23, 2014 | JUSTIN WADE | /s/ JUSTIN WADE |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**



**Washington Mutual**

# WaMu Equity Plus™
## AGREEMENT AND DISCLOSURE

This WaMu Equity Plus(TM) Agreement and Disclosure ("Agreement") governs your home equity line of credit account (the "Credit Line") issued by the Bank identified below and secured by the property at the address identified below. In this Agreement, we use the words "Borrower," "you" and "your" to mean each and all of the persons who sign this Agreement. The words "we," "us" and "our" mean the Bank or any successor or assign. The word "Card" means each credit card that can be used to obtain advances on the Credit Line, whether in the form of purchase transactions, cash advances or otherwise. A Card will be issued only if so indicated in Section I below. Our "business days" are Mondays through Fridays, but federal legal public holidays are excluded. You should read all of this Agreement, but for your convenience, we have set forth some of the rate, payment and fee information on the first two pages. You and we agree as follows:

## I. GENERAL INFORMATION:

| Borrower(s): |
| --- |
| NOOR NORRIS |

| Bank: | Date of Agreement: | Account Number: |
| --- | --- | --- |
| WASHINGTON MUTUAL BANK | 07/26/2007 | ⬛4775 |

| Credit Limit: | Maturity Date: | Initial Draw Period: |
| --- | --- | --- |
| $423,000.00 | 07/31/2037 | 120 Months |

| Property Address: |
| --- |
| 20358 VIA SANSOVINO  PORTER RANCH, CA 91326-4409 |

| Effective Disbursement Date: 07/31/2007 | Card Access: You ☒ will ☐ will not receive a Card to access |
| --- | --- |
| The date on and after which you begin to receive credit advances ("advances") from your Credit Line. This may be a date we specify, which shall follow the expiration of any rescission period required by law, your acceptance of this Agreement, and your meeting of all conditions for the Credit Line. | your Credit Line. If you will not have Card access, the terms and conditions in this Agreement regarding the Card will not be applicable. |

Discounts: The ANNUAL PERCENTAGE RATE used to calculate the periodic FINANCE CHARGES you pay may be discounted based on your other relationships with the Bank and on whether you authorize payments by our Auto Pay service. The available discounts shown in Table A below are explained further in Section VI 5(c). The specific discount amounts and discounted rates are shown in Tables B and C below.

### Table A - Discounts

| Type of Discount | No. of Accounts Required | Minimum Balance Required | Currently Eligible for Discount |
| --- | --- | --- | --- |
| Auto Pay Authorization | 1 | $0.00 | Yes |
| Account Relationships | 1 | $50,000.00 | Yes |
| First Mortgage Relationship | 1 | $0.00 | Yes |

Payments: Send payments to
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or, if a different address is stated in the Periodic Statement, send payments to that address.

## II. VARIABLE RATE ADVANCES:

Variable Rate Index: The Daily Periodic Rate and ANNUAL PERCENTAGE RATE on your Credit Line are subject to change daily based on changes in the "Variable Rate Index", which is the highest "Prime Rate" most recently published in the "Money Rates" table of *The Wall Street Journal*.

Variable Rate Margin: -0.010 % (Does not include any discounts shown in Tables A, B or C)

Maximum Variable Rate: Daily Periodic Rate 0.049315 % (ANNUAL PERCENTAGE RATE 18.000 %)
Minimum Variable Rate: Daily Periodic Rate 0.000000 % (ANNUAL PERCENTAGE RATE 0.000 %)

Minimum Payment: For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period (defined in Section VI.4 below) will be equal to all accrued and unpaid FINANCE CHARGES, late fees and other fees and charges described below, plus any past due amounts and any outstanding balance of your Credit Line in excess of your Credit Limit.

Special Promotional Rates: ☐ If this box is checked, then the special Promotional Rates shown in Table B below will apply beginning on the Effective Disbursement Date and continuing until the following Promotional Rate Expiration Date: N/A .

### Table B - Current Rates on Variable Rate Advances

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
| --- | --- | --- | --- | --- | --- |
| No Discounts | 0.000 % | 0.022575 % | 8.240 % | N/A % | N/A % |
| 1 Discount | 0.250 % | 0.021890 % | 7.990 % | N/A % | N/A % |
| 2 Discounts | 0.500 % | 0.021205 % | 7.740 % | N/A % | N/A % |

## III. FIXED RATE LOAN OPTION ("FRLO"):

Fixed Rate Loan Option Index and Rates: The FRLO is your option to obtain fixed rate loans ("Fixed Rate Loans") under your Credit Line. Except as otherwise specified below under "Promotional Rates," if you choose to exercise the Fixed Rate Loan Option, the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will be determined based on the "FRLO Index", which is the highest "Prime Rate" most recently published in the "Money Rates" table of *The Wall Street Journal*, plus a "FRLO Margin" of 14.0 %.

Promotional Rates: We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a discounted ANNUAL PERCENTAGE RATE that is, an ANNUAL PERCENTAGE RATE that is lower than the sum of the FRLO Index plus the FRLO

3 3 3 6 6 (06/14/07) w8.3

# EXHIBIT A

4775

Margin stated above. The Daily Periodic Rate will also be reduced. These are called "Promotional Rates." If we provide Promotional Rates, they will be shown in a confirmation form that we provide you. FRLO Promotional Rates will remain in effect for the term of the FRLO.

### Table C - Current Rates on Fixed Rate Loans

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.049315 % | 18.000 % | 0.021616 % | 7.890 % |
| 1 Discount | 0.250 % | 0.048630 % | 17.750 % | 0.020932 % | 7.640 % |
| 2 Discounts | 0.500 % | 0.047945 % | 17.500 % | 0.020247 % | 7.390 % |

\*Rates are examples based on a $50,000 FRLO with an Amortizing Minimum Payment and a Term of five (5) years.

Maximum FRLO Rate:   Daily Periodic Rate _____N/A_____ % (ANNUAL PERCENTAGE RATE _____N/A_____ %)
Minimum FRLO Rate:   Daily Periodic Rate _____N/A_____ % (ANNUAL PERCENTAGE RATE _____N/A_____ %)

**FRLO Confirmation:** ☐ If this box is checked, you have chosen to exercise your option to obtain a Fixed Rate Loan on the Effective Disbursement Date. (If you have chosen to obtain a second Fixed Rate Loan on the Effective Disbursement Date, you must complete a separate form that we will provide you upon request.) The terms of your Fixed Rate Loan will be as follows:

| Type: | | FRLO Sub-Account No.: N/A | Amount: N/A |
|---|---|---|---|
| Transaction Fee:  There is no Fixed Rate Loan Option Fee for any Fixed Rate Loan obtained upon opening the Credit Line. | | Daily Periodic Rate: N/A | Term: N/A Months |
| Buydown Fee (FINANCE CHARGE) _____N/A_____ (Equal to _____N/A_____ % of the Fixed Rate Loan Amount | | ANNUAL PERCENTAGE RATE: N/A | N/A % |

**Minimum Payment**
N/A

**Payment Method:**
☐ You have elected to make your Fixed Rate Loan payments by payment coupon or billing statement. If you do not receive your payment coupon or billing statement before your first payment is due, please send your payment, including your FRLO sub-account number (if any), to:
WASHINGTON MUTUAL BANK
CONSUMER LENDING – BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or you may make your payment at any Washington Mutual Financial Center.

☐ You have elected to make your Fixed Rate Loan payments by our Auto Pay service. You will need to sign a separate Auto Pay Automatic Loan Payment Authorization Form.

**How to Get a Fixed Rate Loan After Closing:** Call 1-888-800-8738 toll-free (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that telephone number.

### Table D - Fixed Rate Loan Terms

| Type of Minimum Payment | Fixed Rate Loan Dollar Amount | Maximum Permissible Term |
|---|---|---|
| Amortizing Minimum Payment | Up to $19,999.99 | Up to 120 months (10 years). If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Amortizing Minimum Payment | $20,000.00 or more | Up to _240_ months ( _20_ years). If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Interest Only Minimum Payment | Any amount | 3, 5, 7 or 10 years, but the term must conclude before the Maturity Date |

---

## IV. FEES AND CHARGES:

**FINANCE CHARGES and Other Fees and Charges at Closing:** You agree to pay the following FINANCE CHARGES and other fees and charges, which will be charged to your Credit Line on the Effective Disbursement Date unless paid to us on or before that date. Periodic FINANCE CHARGES will begin to accrue immediately on these amounts if charged to your Credit Line.

**FINANCE CHARGES:**                                    Other Fees and Charges:

\* These items will be paid by the Bank and charged to your Credit Line.

**Additional FINANCE CHARGES:** You agree to pay the following additional FINANCE CHARGES:

**Cash Advance Fee.** A cash advance fee FINANCE CHARGE of 2.00% of each cash advance obtained on the Card, or $2.00, whichever is greater.

**Fee for Small Variable Rate Advance.** If, at our sole option, we elect to honor a request for a Variable Rate  Advance of less than $100.00, a transaction FINANCE CHARGE of 4.00% of the amount of the advance. This FINANCE CHARGE will not be imposed for Card transactions.

**Fee for Lien Subordination.** If, at our sole option, we agree to subordinate the lien of the Security Instrument, a transaction FINANCE CHARGE of _$50.00 - $250.00_ .

3 3 3 6 6 (06/14/07) w8.3

# EXHIBIT A

**Wire Transfer Fee.** A wire transfer **FINANCE CHARGE** of __$30.00__ for each advance that you initiate by a wire transfer.

**Courier Service Fee.** A courier service **FINANCE CHARGE** of __$30.00__ for each transmittal of documents that you request which we send by a delivery service.

**Fixed Rate Loan Option Fee.** A transaction fee **FINANCE CHARGE** of __$50.00__ for each Fixed Rate Loan that you receive. The Fixed Rate Loan Option Fee will be waived for any Fixed Rate Loan received on the Effective Disbursement Date or for the first Fixed Rate Loan received subsequently.

**Buydown Fee.** If we offer you the option to pay a fee in exchange for a reduced **ANNUAL PERCENTAGE RATE** for a Fixed Rate Loan, a transaction fee **FINANCE CHARGE** of 4.000% of the amount of the Fixed Rate Loan will be charged in return for a reduction of 0.250% in the **ANNUAL PERCENTAGE RATE** of the Fixed Rate Loan. At our sole discretion, we reserve the right to charge you a lesser Buydown Fee and/or offer a greater reduction in the **ANNUAL PERCENTAGE RATE** at the time you obtain a Fixed Rate Loan.

**Additional Other Fees and Charges:** You agree to pay the following additional other fees and charges:

**Annual Fee.** An annual fee of __$0.00__ ("Annual Fee"). The Annual Fee will be charged on the first anniversary of the Effective Disbursement Date and on every anniversary thereafter during the Draw Period. The Annual Fee is nonrefundable and will be imposed regardless of the balance and status of the Credit Line.

**Late Fee and Collection Charges.** In addition to our other rights upon default, if we do not receive the Minimum Payment on the Variable Rate Advances or any Fixed Rate Loans within __fifteen (15)__ days after the Payment Due Date shown on your Periodic Statement (or, if applicable, on any payment coupon that we provide you), you will be charged a late fee of the greater of __$15.00__ or __5.000__ % of the Minimum Payment. Upon your default under this Agreement, you will pay all of our reasonable costs and collection charges, whether or not there is a lawsuit, including, without limit, attorneys' fees and legal expenses, including without limit, for bankruptcy or civil proceedings, our efforts to modify or vacate an automatic stay or injunction, appeals, and any anticipated post-judgment collection services, and whether or not such are incurred by our employees or third parties.

**Overlimit Fee.** An overlimit fee of __$20.00__ for each advance from the Credit Line that causes you to exceed your Credit Limit.

**Dishonored Payment Fee.** A fee of __$20.00__ if you make a payment on your Credit Line (including any payment on a Fixed Rate Loan) with a check, draft, or other item or transfer (including an Auto Pay service transfer) that is dishonored for any reason.

**Stop Payment Fee.** A fee of __$20.00__ when you request a stop payment on a Check (as defined in Section VI.6(a) below.) A stop payment shall be effective for six (6) months (or, if applicable, such longer period as provided by law) and must be delivered to us in the manner prescribed by law or by method acceptable to us in our sole discretion and in sufficient time for us to act. If a stop payment notice expires, you must renew it as set forth above and you will be assessed an additional stop payment fee. There is no right to stop payment on transactions by use of a Card or other means of access other than a Check.

**Cancellation Fee.**
A cancellation fee will not apply to this loan. In any event, if you pay off early you will not be entitled to a refund of the loan fee (if any) or any other finance charges already paid.

**Foreign Currency Transactions.** If you use the Card to make a purchase or obtain an advance in a foreign currency (the "transaction currency"), it will be converted by Visa International or MasterCard International (depending on which Card we issue from time to time) into U.S. Dollars (the "billing currency"). The details for conversion are discussed below in Section VI.6. We do not determine the exchange rate that is used and we do not add or subtract any adjustment to the exchange rate.

**Reject Fee.** A reject fee of __$20.00__ if a Check or other advance request (other than for a Card transaction) is not honored for any reason.

**Copy and Research Fees.** A copy fee of __$1.00__ per item and research fees of __$10.00__ per hour will be assessed if you request copies of Checks or other research relating to your Credit Line.

**Release Fee.** A fee of __$65.00__ in connection with the release, discharge or reconveyance of the Security Instrument (as defined in Section VI.3 below).

**Other Institution Fees.** Fees imposed by other institutions if you use the Card to obtain cash advances through their ATMs.

## V. STATE-SPECIFIC NOTICES:

For the State of: CALIFORNIA

**Due on Transfer.** The Security Instrument (as defined in Section VI.3 below) contains the following provisions relating to certain sales and transfers of the Property:
Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Trustor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

**Governing Law.** This Agreement and your Credit Line will be governed by and interpreted in accordance with the laws of the United States of America and, to the extent that such laws are not applicable, with the internal laws of the State of __Nevada__ (without giving effect to any choice of law rule that would cause the application of the laws of any other jurisdiction to the rights and duties of the parties). Interest shall be charged at rates allowed to any class of lender by the laws of the State of __Nevada__.

4775

## VI. STANDARD TERMS AND CONDITIONS:

**1. Promise to Pay.** You promise to pay to us, or our order, all advances from the Credit Line plus all FINANCE CHARGES, fees, charges, expenses and other amounts required by the terms of this Agreement. All amounts outstanding under the Credit Line that are covered by the Fixed Rate Loan Option described in Section VII below are sometimes referred to in this Agreement as "Fixed Rate Loans." All other amounts outstanding under the Credit Line are sometimes referred to in this Agreement as "Variable Rate Advances." Unless otherwise provided in this Agreement, any amounts charged to the Credit Line shall be treated as Variable Rate Advances. If there is more than one of you, each is jointly and severally liable under this Agreement. Each Borrower alone may cancel the Credit Line, receive advances from the Credit Line and, except as stated below, take all actions with respect to the Credit Line. If Section I above indicates that you will receive a Card to access your Credit Line, each of you requests that we issue each Borrower a Card.

Your use of the Card at Automated Teller Machines ("ATMs") is subject to our rules relating to ATM transactions.

**2. Credit Limit.** This Agreement covers a revolving line of credit in the amount shown in Section I above (the "Credit Limit"). During the Draw Period described below, you may obtain advances from the Credit Line up to the Credit Limit, repay any portion of the amounts advanced and obtain additional advances up to the Credit Limit. If there is more than one of you, each of you alone has the right to borrow up to the full amount of the Credit Limit and each of you is liable for all advances made to any of you. You agree not to request or obtain an advance that will make the Credit Line balance exceed the Credit Limit. We may, at our option, make advances in excess of the Credit Limit. At our request, you will immediately repay the amount by which the balance of the Credit Line exceeds the Credit Limit.

**3. Security Instrument.** To secure the performance of your obligations under this Agreement, one or more of you is giving us a deed of trust, deed to secure debt, mortgage or other security agreement (the "Security Instrument") on the real property located at the address specified in Section I above and other property described therein (the "Property"). If the title to the Property is held by a trust, references in this Agreement to "you" and "your" shall include, with respect to the Property and as applicable, a person who is signing the Security Instrument as a trustee of the trust. The Security Instrument secures all advances and other amounts owed under this Agreement as well as after-acquired property located on or attached to the Property. You agree to perform all of your obligations under the Security Instrument. Regardless of the terms of any other security instrument that you have with us, no personal or real property, other than the Property, secures your obligations under this Agreement.

You will perform on a timely basis all payment and other obligations under the terms of any other deed of trust, mortgage, deed to secure debt or other security agreements or leases on the Property, as well as under any note or other obligation the performance of which is secured by the same.

**4. Draw Period and Post Draw Period; Payments.** You may obtain advances from the Credit Line for the number of years after the Effective Disbursement Date described in Section I above (the "Draw Period"). At our option, we may extend the Draw Period for up to two (2) additional periods that are each no longer than the initial Draw Period stated in Section I above. The period of time, if any, between the end of the Draw Period and the Maturity Date is the "Post Draw Period." If the Draw Period is for ten (10) years, the Post Draw Period will be for twenty (20) years. If the Draw Period is for twenty (20) years, the Post Draw Period will be ten (10) years. For example if the Draw Period is for thirty (30) years, there will not be a Post Draw Period. During the Post Draw Period, if any, you will no longer be able to obtain advances from the Credit Line.

Payments for both Variable Rate Advances and any Fixed Rate Loans are due monthly. The payment due date (the "Payment Due Date") may be different for Variable Rate Advances and Fixed Rate Loans, and each Fixed Rate Loan may have its own Payment Due Date. At our sole option, we may change the Payment Due Dates at any time, and we may establish one Payment Due Date each month for all payments due with respect to the Variable Rate Advances and each Fixed Rate Loan. The Payment Due Date will be stated in your periodic billing statement (the "Periodic Statement") or, if applicable, on any payment coupons that we provide you.

For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period will be equal to the amount specified in Section II above as the Minimum Payment. Paying the Minimum Payments will not repay the principal that is outstanding on the Credit Line. You will be required to pay the entire outstanding balance of the Variable Rate Advances (together with all accrued and unpaid FINANCE CHARGES relating to the Variable Rate Advances and all other related amounts that you owe under this Agreement) in a single

payment on the Maturity Date. We are not obligated to refinance any amount due on the Maturity Date. Your payments for any Fixed Rate Loans are described in Section VII below. For both Variable Rate Advances and Fixed Rate Loans, the following shall apply to payments. Payments must be made in U.S. Dollars. When you pay by check, funds must be drawn on a U.S. office of the financial institution. All payments shall be mailed, postage prepaid, to the address that appears on your Periodic Statement (or, if applicable, on any payment coupons that we provide you) for receipt of payments. Any payments that are not received on a business day, or that are received after 5:00 p.m. (prevailing Pacific Time) on a business day, will be treated as having been received on the next following business day. We can accept and apply any late or partial payments, or payments marked "Payment in Full" or similar statement, or with a request to apply a payment in a particular manner, to amounts you owe as set forth in this Agreement without liability on our part and without losing any of our rights under this Agreement. You will not make payments from funds obtained from the Credit Line or any other line of credit from the Bank or any of its affiliates. Payments accepted by the Bank on your Credit Line may be subject to temporary holds on the availability of funds before the payment amount may be re-advanced.

Each month, you will be required to send us one payment for the Variable Rate Advances and an additional separate payment for each Fixed Rate Loan. At our sole option, we may change this process at any time and require you to send us a single payment for both the Variable Rate Advances and your Fixed Rate Loan(s). Each payment will first be applied to accrued and unpaid periodic FINANCE CHARGES, then to any principal due, then to other FINANCE CHARGES, then to other fees and charges, and then to the unpaid principal balance. If you make a payment but do not specify where it should be applied, we will apply the payment in our discretion to outstanding Fixed Rate Loan(s) and/or Variable Rate Advances.

**5. Periodic FINANCE CHARGE; Daily Periodic Rate; ANNUAL PERCENTAGE RATE.** The date on which periodic FINANCE CHARGES begin to accrue will depend upon the type of advance you obtain from the Credit Line. Periodic FINANCE CHARGES will begin to accrue from the date that we initiate a wire transfer, the date that you request to advance from one of our Financial Centers, the effective date of a Card transaction, the effective date of your withdrawal of funds from an ATM, the date that a Check (as defined below) is processed by us, the date of any increase to the balance of the Variable Rate Advances in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4 below, the date that we prepare a check to fund a Fixed Rate Loan on the Effective Disbursement Date or, thereafter, on the effective date of the conversion of all or any portion of the Variable Rate Advances and/or one or more existing Fixed Rate Loans into a new Fixed Rate Loan and, for any other types of advances, the date the advance is made. Periodic FINANCE CHARGES will continue to accrue until all amounts subject to the periodic FINANCE CHARGES are paid in full. There is no free ride period that would allow you to avoid paying a periodic FINANCE CHARGE on advances you obtain from the Credit Line.

During both the Draw Period and any Post Draw Period, the periodic FINANCE CHARGE on the Variable Rate Advances for each billing period is a function of the Daily Periodic Rate (as described below), the Average Daily Balance (as described below), and the number of days in the billing period, as follows:

(a) The Daily Balance of your Variable Rate Advances for each day of the billing period will be all Variable Rate Advances due at the beginning of that day, plus all new Variable Rate Advances (including, without limitation, any increase to the balance of the Variable Rate Advances in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4 below), less all payments and credits relating to Variable Rate Advances received that day. Nothing in this Section VI.5 authorizes you to obtain advances from the Credit Line during the Post Draw Period.

(b) The Average Daily Balance is the sum of the Daily Balances of all days in the billing period divided by the number of days in the billing period.

(c) The ANNUAL PERCENTAGE RATE and Daily Periodic Rate may vary. Except as stated below, the ANNUAL PERCENTAGE RATE will be equal to the sum of the Variable Rate Index stated in Section II above plus the Variable Rate Margin stated in Section II above, and the Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). The ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table B in Section II above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. You will be eligible for a discount (an "Auto Pay" if you authorize automatic loan payments for Variable Rate Advances using our Auto Pay service from an account at the Bank that you designate. If you qualified for an Auto Pay discount, you will no longer qualify if you or we cancel the Auto Pay or if you change to an automatic debit arrangement involving an account at another financial institution. You may separately decide whether you wish to authorize Auto Pay for the Variable Rate Advances and for each Fixed Rate Loan. Your

# EXHIBIT A

decision whether or not to authorize our Auto Pay service will not affect the availability of the Variable Rate Advances or Fixed Rate Loans. You will be eligible for a discount for "Account Relationships" as indicated in Table A if you maintain at least the specified number of accounts and the dollar amount of deposit, credit and investment accounts with the Bank, or its affiliate, as defined by the Bank. If you qualified for an "Account Relationships" discount, you will no longer qualify if the combined balances of the accounts fall below the minimum required. Further, an account will no longer be considered for the combined balance calculation if it becomes 30 or more days past due, is closed, or if no Borrower continues to be on title for the account. You will be eligible for a discount for a "First Mortgage Relationship" as indicated in Table A if you have outstanding the specified loan account and balance with the Bank, as defined by the Bank. If you qualified for a "First Mortgage Relationship" discount, you will no longer qualify if the loan used to obtain the discount becomes 30 or more days past due, is paid off or otherwise closed, or if no Borrower continues to be a borrower of record for the loan. Any discount marked "Not Applicable" or with similar language in Table A will not be available to you. If you do not qualify for a discount initially, but subsequently do so, the discount (up to the maximum number and amount of discount stated in Table B above) will be put into effect as of a date that we select.

Except as otherwise provided in this Section VI.5(c), the ANNUAL PERCENTAGE RATE and Daily Periodic Rate will change, beginning on the day following the Effective Disbursement Date, on each day that the Variable Rate Index changes. The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE for Variable Rate Advances will never be more than the maximum rates, and will never be less than the minimum rates, shown in Section II above. Increases in the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will increase your Minimum Payment, periodic FINANCE CHARGES, and your final payment due on the Maturity Date.

(d) If Section II above indicates that special promotional rates will apply, then the initial Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will be lower than the sum of the Variable Rate Index plus the Variable Rate Margin. These lower rates are called "Promotional Rates." The Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). If you are provided with Promotional Rates, the ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discount shown in Table B in Section II above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount initially, but subsequently do so, the discount (up to the maximum discount stated in Table B above) will be put into effect as of a date that we select. If you are provided with Promotional Rates, the Promotional Rates will remain in effect until the Promotional Rate Expiration Date stated in Section II above, on which date the higher Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE determined in accordance with Section VI.5(c), (f) will apply.

(e) The current Daily Periodic Rates and corresponding ANNUAL PERCENTAGE RATE are specified in Table B in Section II above. These rates will depend on (i) whether you have qualified for one or more discounts, (ii) whether you are being provided with Promotional Rates, or (iii) whether you have both qualified for one or more discounts and are being provided with Promotional Rates.

(f) If you have qualified for one or more discounts in the ANNUAL PERCENTAGE RATE (including any Promotional Rate), but thereafter you no longer qualify, the discount(s) will be eliminated on the date that you fail to qualify. On that date, the ANNUAL PERCENTAGE RATE will increase by the amount of the discount(s) for which you no longer qualify, and the Daily Periodic Rate will increase to the new ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). For example, if you initially qualified for two discounts, but later qualify for only one discount, the increase in the ANNUAL PERCENTAGE RATE will equal the amount by which "2 discounts" exceeds "1 discount" in Table B. However, the increased Daily Periodic Rate and ANNUAL PERCENTAGE RATE will not be greater than the maximum rates stated in Section II above. Increases in the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will increase your Minimum Payment, periodic FINANCE CHARGES, and your final payment due on the Maturity Date.

(g) The "Variable Rate Index" is stated in Section II above. If the Variable Rate Index, or any substitute Variable Rate Index, is no longer available, we will choose a new Variable Rate Index. The new Variable Rate Index will have a historical movement substantially similar to that of the prior Variable Rate Index, and the Variable Rate Margin will be changed so that the new Variable Rate Index plus the Variable Rate Margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the ANNUAL PERCENTAGE RATE in effect at the time the prior Variable Rate Index becomes unavailable (plus any increase in the ANNUAL PERCENTAGE RATE that results from any termination of any Promotional Rate and/or the discounts, as described in Section VI.5(d), (f)).

(h) The Daily Periodic Rate may change within a single billing period. If only one Daily Periodic Rate is in effect during

the billing period, the periodic FINANCE CHARGE for the billing period will be calculated by first multiplying the Average Daily Balance by the applicable Daily Periodic Rate, and then multiplying that amount by the number of days in the billing period. If more than one Daily Periodic Rate is in effect during a billing period, the periodic FINANCE CHARGE for the billing period will be calculated by: (i) calculating a periodic FINANCE CHARGE for each Daily Periodic Rate by first multiplying that Daily Periodic Rate by the Average Daily Balance, and by then multiplying that amount by the number of days that such Daily Periodic Rate is in effect during the billing period, and (ii) by then adding together the periodic FINANCE CHARGES that are so determined for each such Daily Periodic Rate.

The ANNUAL PERCENTAGE RATE for both the Variable Rate Advances and the Fixed Rate Loans do not include costs other than interest. The periodic FINANCE CHARGE and ANNUAL PERCENTAGE RATE for the Fixed Rate Loans are described in Section VII below.

6. Variable Rate Advances. Provided you are not in default and your right to obtain advances has not been terminated, suspended or cancelled, you may obtain Variable Rate Advances during the Draw Period on and after the Effective Disbursement Date. All advances, other than by Card transactions outside the United States (as described below), shall be in U.S. Currency. You may obtain Variable Rate Advances as follows:

(a) Writing a preprinted check ("Check") that we supply to you for use with your Credit Line. The signature of only one Borrower is required for each Check.

(b) Using the Card to effect purchases, obtain cash advances at authorized ATMs (using the separate Personal Identification Number ("PIN") that we will supply to each of you), obtain cash advances at other locations or otherwise obtain advances.

(c) Requesting an advance in person at any of our Financial Centers. You will need to provide acceptable identification to obtain an advance.

(d) A wire transfer of funds to an account that you designate. Wire transfers are subject to our rules governing wire transfer transactions.

You authorize us to make available additional means of obtaining advances. These advances will also be subject to this Agreement.

In addition, the balance of the Variable Rate Advances may be increased in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4(c) below.

If you use the Card to make a purchase or obtain an advance in a foreign currency (the "transaction currency"), it will be converted by Visa International or MasterCard International (depending on which Card we issue from time to time) into U.S. Dollars (the "billing currency"). Visa International or MasterCard International, as applicable, will use the procedures set forth in its operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, the Visa International operating regulations state that the exchange rate between the transaction currency and the billing currency is: (i) a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives or (ii) the government-mandated rate in effect for the applicable central processing date, in each instance, plus or minus an adjustment determined by the card issuer. The exchange rate for the applicable central processing date may differ from the rate in effect on the transaction date or the posting date. Currently, the MasterCard International conversion procedures state that the exchange rate between the transaction currency and the billing currency is either a wholesale market rate or a government-mandated rate as of a date selected by MasterCard International, in each instance plus or minus an adjustment determined by the card issuer. The exchange rate used by MasterCard International may differ from the rate in effect on the transaction date or the posting date. Regardless of which Card is used, the exchange rate used may be the same as, greater than, or less than the rate that would be available through a financial institution in the country in which the purchase or advance occurred. We do not determine the exchange rate that is used and we do not add or subtract any adjustment to the exchange rate.

7. Minimum Advances and Other Limitations. Each Variable Rate Advance, other than a purchase transaction with a Card, must be not less than $100.00. We may, at our option, make Variable Rate Advances of less than $100.00. At our option, we may (but reserve the right not to) honor any requests for advances in the following circumstances:

(a) Your credit privileges have been cancelled, suspended or terminated.

(b) Your Credit Limit is currently exceeded or would be exceeded if we honored the advance requested.

(c) Your Check is post-dated (written and presented before the date on the item) or stale dated (presented more than six (6) months after the date of the item).

(d) Your Check bears a restriction or notation.

(e) Your Checks have been reported lost or stolen or, if advances requiring a PIN have been authorized, you have reported that your PIN has been compromised.

# EXHIBIT A

(f)  You are in material default of this Agreement or would be so if we honored the advance request.

(g)  We receive conflicting instructions or demands from any of you.

(h)  You have asked us to prepare a payoff demand statement setting forth the amounts required to satisfy your obligations under this Agreement.

You agree to hold us harmless from and indemnify us against any claim or loss the payee or any other endorser or depositing or collecting bank may assert regarding such restrictions, notations or post or stale dated items. You further agree to indemnify and hold us harmless for any claim or loss relating to honoring or refusing to honor any instructions or demands which we believe may be conflicting.

Our liability, if any, for wrongful dishonor of an advance request is limited to your actual damages, shall not include consequential damages and in no event will exceed the amount of the advance request.

Checks may be processed mechanically based on information encoded on the item. Checks not meeting our format and encoding specifications may not be honored. The signature on each Check should match the signature on file with us, however, we may not verify the signature if the item is processed mechanically. Subject to applicable law, we will only pay Checks that are presented to us by another financial institution. We do not "certify" Checks drawn on your Credit Line.

8.  Illegal Transactions.  You will not use any advance, the Card, a Check or other access device to engage in any Internet gambling or illegal transaction (including, without limitation, illegal gambling).  We are not responsible for preventing you from doing so.

9.  Periodic Statement.  As required by law, we will send you a Periodic Statement showing all new transactions since the prior Periodic Statement closing date and other information relating to the Credit Line.  The Periodic Statements may be sent on other than a calendar month basis.  We reserve the right to change the Periodic Statement closing date.  We may choose not to return Checks along with your Periodic Statement.

10. Loss or Theft.  Notify us if any unauthorized use of your Credit Line has occurred or may occur as a result of loss or theft of one or more of your Checks, Cards or other access device or if you believe someone else knows your PIN.  The best way to notify us is by calling us.  Call us at 800-566-5678 (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that number.  You may also write us at the address stated in Section VI.16 below.  You agree to reasonably assist us in determining the facts and circumstances relating to any unauthorized use of your Credit Line.

11. Termination and Acceleration; Suspension of Advances and Reduction of Credit Limit; Other Remedies.

(a)  We may terminate your Credit Line and require you to pay us the entire outstanding balance of the Credit Line (including the outstanding balance of any Fixed Rate Loans), together with all other fees, charges and amounts owing under this Agreement or the Security Instrument, in one payment, if any of the following happen:

(i)  You commit fraud or make a material misrepresentation at any time in connection with the Credit Line.  This can include, for example, a false statement about your income, assets, liabilities or any other aspect of your financial condition.

(ii)  You do not meet any of the repayment terms of this Agreement.

(iii)  Your action or inaction adversely affects the Property or our rights in the Property.  This can include, for example, failure to maintain required insurance or pay taxes on the Property, waste or destructive use of the Property which impairs our security, death of the last Borrower, death of all but one Borrower which impairs our security, transfer of title or sale of the Property without our permission, permitting the creation of a senior lien on the Property, foreclosure by the holder of a prior lien on the Property or use of the Property for an illegal purpose that subjects the Property to seizure.

If we terminate the Credit Line, no additional advances will be made and the entire outstanding balance of the Credit Line (including the outstanding balance of any Fixed Rate Loans) will be immediately due and payable without prior notice, except as may be required by law, and you agree to pay immediately such amount plus any other amounts due under this Agreement.

Failure to meet the repayment terms of any portion of the Credit Line, such as for Fixed Rate Loans or for Variable Rate Advances, will be considered failure to meet the repayment terms of the entire Credit Line, and this will give us the right to demand the immediate repayment of the entire outstanding balance of the Credit Line and to exercise any of our other rights under this Agreement.  Likewise, payment of only a portion of the amount required under the repayment terms of this Agreement will not satisfy your repayment obligations for

the entire Agreement.  If a partial payment is made, we reserve the right to accept the payment and apply it to the outstanding balance of the Credit Line in accordance with Section VI. 4 without waiving our right to demand immediate payment of the entire outstanding balance of the Credit Line or to exercise any of our other rights under this Agreement.

(b)  In addition to any other rights we may have, we can suspend additional advances (including any Fixed Rate Loans) or reduce your Credit Limit during any period in which any of the following are in effect:

(i)  The value of the Property declines significantly below the value as determined by us at the time you applied for your Credit Line.  This includes, for example, a decline such that the difference between the Credit Limit and the available equity is reduced by fifty percent (50.00%) and may include a smaller decline depending on individual circumstances.

(ii)  We reasonably believe that you will be unable to fulfill your payment obligations under this Agreement due to a material adverse change in your financial circumstances.

(iii)  You are in default of a material obligation of this Agreement.  We consider all of your obligations to be material.  Categories of material obligations include, for example, the events described above permitting us to terminate, obligations and limitations relating to your receipt of advances, obligations concerning maintenance or use of the Property, obligations to perform the terms of the Security Instrument or any other deed of trust, mortgage, deed to secure debt or other security agreement or lease on the Property (and to perform on any notes or other obligations secured by the same), obligations to notify us and to provide documents and information to us (such as updated financial information), and obligations to comply with applicable law (such as zoning restrictions).

(iv)  We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(v)  The priority of our security interest in the Property is adversely affected by government action to the extent that the value of the security interest is less than 120.00% of the Credit Limit.

(vi)  We have been notified by a government authority that continued advances may constitute an unsafe and unsound business practice.

(vii) If the maximum ANNUAL PERCENTAGE RATE stated in Section II above has been reached.

Regardless of any action that we take, all other terms of this Agreement will remain in effect and be binding upon you.

(c)  If, at any time, we have the right to terminate your Credit Line under Section VI.11(a) above, we may, at our sole option and without prior notice to you, then or thereafter convert any or all of your Fixed Rate Loans (including both the unpaid principal balance of the Fixed Rate Loans plus all accrued and unpaid FINANCE CHARGES) to the balance of your Variable Rate Advances, which will then accrue FINANCE CHARGES in accordance with Section VI.5 above and be subject to all other provisions of this Agreement relating to Variable Rate Advances.  No exercise of this right to convert and nothing in this Section VI.11(c) shall constitute an election of remedies or a waiver of any of our rights under the remaining provisions of this Section VI.11, the remainder of this Agreement, the Security Instrument or at law or in equity.

(d)  Any Borrower may cancel the Credit Line or suspend the right to obtain advances by sending a written notice of cancellation or suspension to the address stated in Section VI.16 below.  The notice must identify the account number of the Credit Line and be signed by at least one Borrower.  The notice will be effective when it has been received and accepted by us.  If the right to obtain advances is suspended at the request of a Borrower, advances will be reinstated only following our receipt and approval of a written request for reinstatement that has been signed by each of you.

(e)  If the Credit Line is cancelled, suspended or terminated, you agree not to attempt to write or deliver any Checks, use a Card or any other access device or otherwise obtain advances.  You will return all Cards and unused Checks to us.  You remain liable for any use of Checks, Cards or other access devices and any advances taken even after any cancellation by you or us, termination or suspension.  If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or release of the Security Instrument for a reasonable period of time to enable us to post to your Credit Line any advances that you have received.

Our rights under this Agreement shall be in addition to any other rights we may have under the Security Instrument or at law or in equity.

12. Delay in Enforcement; Corrections.  To the extent permitted by law, we may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right and if we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice.  We may correct any inaccuracies that we find with respect to the Credit Line or any Periodic Statements.

13. Presentment.  You waive any statutes of limitations, and any legal requirements of presentment, demand, protest, notice of dishonor and notice of protest of this Agreement.

3 3 3 6 6 (06/14/07) w8.3

**EXHIBIT A**

**14. Credit Information.** You will provide us with a current financial statement, a new credit application, or both, at any time upon our request. We may obtain credit reports on you at any time for the purpose of reviewing or collecting your Credit Line. You authorize us to release information to others (such as credit bureaus, merchants, other financial institutions and any of our affiliate companies) about our transactions or experiences with you. WE MAY REPORT INFORMATION ABOUT YOUR ACCOUNT TO CREDIT BUREAUS. LATE PAYMENTS, MISSED PAYMENTS, OR OTHER DEFAULTS ON YOUR ACCOUNT MAY BE REFLECTED IN YOUR CREDIT REPORT.

**15. Transfer and Assignment.** Without prior notice to or approval from you, we reserve the right to sell or transfer this Agreement, the Credit Line and our obligations under this Agreement to any other person. Your rights under this Agreement belong to you only and may not be transferred, assumed or assigned. Your obligations, however, are binding upon your heirs and legal representatives.

**16. Notices.** Except as otherwise provided in this Agreement, notices must be in writing. Notice to any of you shall be deemed notice to all of you. Notices shall be deemed given when deposited in the U.S. Mail, postage prepaid first class mail, or when delivered in person, or sent by registered or certified mail, or by nationally recognized overnight carrier. Notice to you shall be sent to your last known address in our records for the Credit Line. Notice to us must be sent to:

WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6968
LAKE WORTH, FL 33466

or, if a different address is stated in the Periodic Statement, to that address. Any party may change its address for receipt of notices by giving notice of the same, as set forth herein, to the other parties. You agree to notify us immediately if you change your name, address or employment or if any of you dies, is declared incompetent or is the subject of a bankruptcy or insolvency proceeding.

**17. Tax Consequences.** You should consult your own tax advisor regarding the tax deductibility of interest and charges under this Agreement.

**18. Special Terms.** In our sole discretion, we may offer you special terms on Variable Rate Advances from time to time. The special terms may include, by way of example, reduced rates, reduced fees, and reduced payments. The special terms may be available for temporary periods of time and on a limited basis.

**19. Amendment.** In addition to other changes described in this Agreement, we may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line or if the change is insignificant.

**20. Interpretation.** The names given to sections or paragraphs in this Agreement are for convenience and shall not be used to interpret this Agreement. This Agreement, the Periodic Statements and, if applicable, any payment coupons that we provide you are the best evidence of your agreement with us. If any provision of this Agreement, the Periodic Statements or any such payment coupons is found not to be valid or enforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of such provision or the remaining provisions of that document, which provisions shall continue to be binding, valid and enforceable.

## VII. FIXED RATE LOAN OPTION

**1. Introduction.** If indicated in Section III above, you have the option (the "Fixed Rate Loan Option") to obtain advances from your Credit Line in the form of Fixed Rate Loans as described in this Section. Except as stated below, the Fixed Rate Loans will be subject to a fixed Daily Periodic Rate and ANNUAL PERCENTAGE RATE and a fixed term.

**2. General Terms and Conditions for the Fixed Rate Loan Option.** The following shall apply to the Fixed Rate Loan Option:

(a) The Fixed Rate Loan Option may be exercised only during the Draw Period.

(b) You may exercise the Fixed Rate Loan Option to obtain up to two (2) Fixed Rate Loans on the Effective Disbursement Date (which, in the aggregate, may be any amount up to the then available portion of the Credit Limit. Thereafter, you may only exercise the Fixed Rate Loan Option by converting all or any portion of (i) the outstanding Variable Rate Advances, and/or (ii) one (1) or more existing Fixed Rate Loans, into a new Fixed Rate Loan in accordance with our procedures. Following the Effective Disbursement Date, you may not obtain a Fixed Rate Loan by obtaining an advance of new funds from the Credit Line.

(c) Each Fixed Rate Loan may be for any amount, but the aggregate of all Fixed Rate Loans and outstanding Variable Rate Advances may not exceed your available Credit Limit.

(d) The portion of the Credit Limit that is available to you for Variable Rate Advances will be reduced by the amount of each Fixed Rate Loan. Any repayment of the principal amount

of a Fixed Rate Loan during the Draw Period will restore the available Credit Limit by an equal amount.

(e) You may exercise a Fixed Rate Loan Option only if no defaults exist under the terms of this Agreement or the Security Instrument, your right to obtain advances has not been terminated, suspended or cancelled and you sign all documents required by us. You may not obtain more than two (2) Fixed Rate Loans in any one (1) calendar year period and may not have more than five (5) Fixed Rate Loans outstanding at any time. You may not have outstanding at any time more than one Fixed Rate Loan that provides for an "Interest Only Minimum Payment" as described in Section VII.3(b) below. Notwithstanding any other provisions of this Section VII.2, we may convert any or all of your Fixed Rate Loans to the balance of your Variable Rate Advances in accordance with Section VI.11(c) above.

(f) You will be required to pay a Fixed Rate Loan Option Fee in the amount stated in Section IV above for each Fixed Rate Loan that you receive, except as provided in Section IV above. You may pay this fee prior to the making of the Fixed Rate Loan or it will be added to the principal balance of the Fixed Rate Loan.

(g) Except as stated below, the ANNUAL PERCENTAGE RATE that will apply to each Fixed Rate Loan will be equal to the sum of the FRLO Index stated in Section III above that is in effect on the day you exercise the Fixed Rate Loan Option to obtain that Fixed Rate Loan plus the FRLO Margin stated in Section III above. The ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table C in Section III above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount(s) when you exercise the Fixed Rate Loan Option, but you subsequently do so, the ANNUAL PERCENTAGE RATE for the Fixed Rate Loan will not be decreased.

If the FRLO Index, or any substitute FRLO Index, becomes unavailable, we will choose a new FRLO Index. The new FRLO Index will have a historical movement substantially similar to that of the prior FRLO Index, and the FRLO Margin will be changed so that the new FRLO Index plus the FRLO Margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the ANNUAL PERCENTAGE RATE that would have been in effect at the time the prior FRLO Index becomes unavailable.

The Daily Periodic Rate for the Fixed Rate Loan will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE for the Fixed Rate Loan will not be greater than the maximum rates, and will not be less than the minimum rates, stated in Section III above. The periodic FINANCE CHARGE on the Fixed Rate Loan for each billing period will be a function of the outstanding principal balance of the Fixed Rate Loan each day of the billing period and the applicable Daily Periodic Rate. The outstanding principal balance of the Fixed Rate Loan for each day of the billing period is calculated by starting with the beginning principal balance that day and then subtracting any payments or credits relating to the Fixed Rate Loan received that day. The periodic FINANCE CHARGE that will apply to the Fixed Rate Loan for each billing period will be determined by first multiplying the applicable Daily Periodic Rate by the outstanding principal balance of the Fixed Rate Loan for each day of the billing period and then adding together the resulting amounts.

You will be deemed to exercise a Fixed Rate Loan Option when the FRLO Confirmation provisions in Section III above are completed and you sign this Agreement, when you sign any other required documentation at the time that you sign this Agreement, when you sign the required documentation at one of our Financial Centers, or when you call the toll-free telephone number described in Section III above and provide us with all required information.

(h) We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE that will be lower than the sum of the FRLO Index plus the FRLO Margin as described in accordance with Section VII.2(g). These lower rates are called "Promotional Rates". The Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). If you are provided with Promotional Rates, the ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table C in Section III above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount(s) when you exercise the Fixed Rate Loan Option, but you subsequently do so, the ANNUAL PERCENTAGE RATE for the Fixed Rate Loan will not be decreased. If we provide a Fixed Rate Loan at Promotional Rates, we are not obligated to offer Promotional Rates on any subsequent Fixed Rate Loans. The amount of the Promotional Rates may change from time to time.

In addition to any Promotional Rates and discounts shown in Table C in Section III above, we may, at our sole discretion and without prior notice, offer you the option to pay a fee ("Buydown Fee") to reduce the rate further on your Fixed Rate

**EXHIBIT A**

4775

Loan. If we offer and you accept this buydown option, the **ANNUAL PERCENTAGE RATE** that would otherwise be applicable to the Fixed Rate Loan will be reduced and the Daily Periodic Rate will be equal to the reduced **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). The amount of the Buydown Fee that you must pay, and the amount of the reduction in the **ANNUAL PERCENTAGE RATE**, are stated in Section IV above. At our sole discretion, we reserve the right to charge you a lesser Buydown Fee and/or offer a greater reduction in the **ANNUAL PERCENTAGE RATE** at the time you obtain a Fixed Rate Loan, and this may vary from one Fixed Rate Loan to another. A separate Buydown Fee must be paid for each Fixed Rate Loan that is subject to the buydown option. You must pay the Buydown Fee prior to the making of the Fixed Rate Loan or it will be added to the principal balance of the Fixed Rate Loan. If you prepay the Fixed Rate Loan, none of the Buydown Fee will be returned to you or credited to your Fixed Rate Loan or Credit Line. If we offer you the buydown option for a Fixed Rate Loan, we are not obligated to offer the buydown option for any subsequent Fixed Rate Loans. The reduction in the **ANNUAL PERCENTAGE RATE** resulting from the buydown option will remain in place for the full term of the Fixed Rate Loan, but the **ANNUAL PERCENTAGE RATE** may be increased as otherwise provided in this Section VII.

(i) The current Daily Periodic Rates and corresponding **ANNUAL PERCENTAGE RATES** are specified in Table C in Section III above. These rates will depend on (i) whether you have qualified for one or more discounts, (ii) whether you are being provided with Promotional Rates, or (iii) whether you have both qualified for one or more discounts and are being provided with Promotional Rates.

(j) If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE**, but thereafter you no longer qualify, the discount(s) will be eliminated on the date that you fail to qualify. On that date, the **ANNUAL PERCENTAGE RATE** of each Fixed Rate Loan will increase by the amount of the discount(s) for which you no longer qualify, and the Daily Periodic Rate will increase to the new **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). For example, if you initially qualified for two discounts, but later qualify for only one discount, the increase in the **ANNUAL PERCENTAGE RATE** will equal the amount by which "2 discounts" exceeds "1 discount" in Table C. However, the increased Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will not be greater than the maximum rates stated in Section III above.

**3. Choice of Terms and Minimum Payment for the Fixed Rate Loan Option.** You have the following choices regarding the term and Minimum Payment for a Fixed Rate Loan:

(a) *Amortizing Minimum Payment.* With this choice, you may determine the amortization term of each Fixed Rate Loan ("Term") at the time you exercise the Fixed Rate Loan Option. The Term shall be in increments of one (1) year. The maximum permissible Terms available for the Fixed Rate Loan are stated in Table D in Section III above and will depend upon the dollar amount of the Fixed Rate Loan. Your Minimum Payment for the Fixed Rate Loan is the amount sufficient to repay the original principal balance of the Fixed Rate Loan, together with periodic **FINANCE CHARGES** at the applicable **ANNUAL PERCENTAGE RATE**, in full in substantially equal monthly installments during the Term that you will select at the time you exercise the Fixed Rate Loan Option. The entire outstanding principal balance of the Fixed Rate Loan together with all accrued and unpaid **FINANCE CHARGES**, if not sooner paid, will be due and payable in full in a single payment on the earlier of the Credit Line Maturity Date or the last day of the scheduled Term. We are not obligated to refinance this amount."

(b) *Interest Only Minimum Payment.* With this choice, you must select one of the terms for the Fixed Rate Loan that is described in Table D in Section III above. You must make this selection at the time you exercise the Fixed Rate Loan Option. Your Minimum Payment will be equal to all of the unpaid periodic **FINANCE CHARGES** that have accrued on the outstanding principal balance of the Fixed Rate Loan at the applicable **ANNUAL PERCENTAGE RATE**. Your Minimum Payments will not repay any of the outstanding principal balance of the Fixed Rate Loan. At the conclusion of the term of the Fixed Rate Loan, the entire outstanding principal balance of the Fixed Rate Loan, together with all accrued and unpaid **FINANCE CHARGES** and all other fees and charges relating to the Fixed Rate Loan, automatically will be transferred to the balance of your Variable Rate Advances, which will then accrue **FINANCE CHARGES** in accordance with Section VI.5 above and be subject to all other provisions of this Agreement relating to Variable Rate Advances. If you choose to pay only the Minimum Payments, then (i) the payments on your Variable Rate Advances may increase substantially following the conclusion of the term of the Fixed Rate Loan, and (ii) the final payment due on the Maturity Date may increase substantially.

You must make your choices regarding a Fixed Rate Loan at the time you exercise the Fixed Rate Loan Option for the loan in accordance with our procedures. You may make a different choice for each Fixed Rate Loan that you obtain.

We will notify you of the amount of the Minimum Payment for

the Fixed Rate Loan. If the Fixed Rate Loan has an Amortizing Minimum Payment, your final Minimum Payment may be for a period of less than one month and, if so, we may apply the excess amount of the payment to the outstanding principal balance of the Fixed Rate Loan, which may reduce the amount of your final scheduled payment on the Fixed Rate Loan. Your Minimum Payment on each Fixed Rate Loan is in addition to the Minimum Payments that you must pay on any other Fixed Rate Loans and on the Variable Rate Advances.

**4. Change in Minimum Payment Following Termination of Discount(s).** If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE**, but thereafter you no longer qualify, the discount(s) will be eliminated and the **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate of each Fixed Rate Loan will increase in accordance with Section VII.2(j). Your Minimum Payment will also increase. Your new Minimum Payment will be determined in accordance with the applicable paragraphs of Section VII.3 above, with this exception that (a) the Minimum Payment will be calculated using the increased **ANNUAL PERCENTAGE RATE** and, (b) if the Fixed Rate Loan has an Amortizing Minimum Payment, the Minimum Payment will be based on the anticipated unpaid principal balance and remaining scheduled Term of the Fixed Rate Loan. For a Fixed Rate Loan with an Amortizing Minimum Payment, the periodic **FINANCE CHARGES**, the Minimum Payment, and any payment due on the earlier of the Credit Line Maturity Date or the last day of the Term will increase. For a Fixed Rate Loan with an Interest Only Minimum Payment, the periodic **FINANCE CHARGES**, the Minimum Payment, the balance transferred to your Variable Rate Advances at the conclusion of the Fixed Rate Loan, the amount of the Minimum Payments due on the Variable Rate Advances, and the final payment due on the Maturity Date will increase. We will notify you of the amount of the new Minimum Payment for the Fixed Rate Loan.

**5. Special Terms.** In our sole discretion, we may offer you special terms on Fixed Rate Loans from time to time. The special terms may include, by way of example, reduced rates, reduced fees, and reduced payments. The special terms may be available for temporary periods of time and on a limited basis.

**6. Conflicts.** In the event of any conflict or inconsistency between the provisions of this Section VII and the remaining provisions of this Agreement, the provisions of this Section VII shall prevail. Except as otherwise provided in this Section VII, all remaining provisions of this Agreement shall apply to the Fixed Rate Loans in accordance with their terms.

## VIII. BILLING RIGHTS

**YOUR BILLINGS RIGHTS**
**KEEP THIS NOTICE FOR FUTURE USE**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us in Case of Errors or Questions About Your Bill.* If you think your bill is wrong, or if you need more information about a transaction on your bill, write us (on a separate sheet) at the address listed on your bill. Write to us as soon as possible. You must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
* Your name and account number.
* The dollar amount of the suspected error.
* Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your deposit account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities After We Receive Your Written Notice.* We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including **FINANCE CHARGES**, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. If we find that we made a mistake on your bill, you will not have to pay any **FINANCE CHARGES** related to any questioned amount. If we did not make a mistake, you may have to pay **FINANCE CHARGES** and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may

Page 8 of 9


**EXHIBIT A**

report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50.00 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases.* If you have a problem with the quality of property or services that you purchased with a credit card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services. There are two limitations on this right:

    (a)  You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

    (b)  The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant or if we mailed you the advertisement for the property or services.

**SIGNATURES**

By signing below, you agree to the terms of this Agreement and you acknowledge that you have read and received a copy of this Agreement.

NOOR NORRIS

Pay to the order of

Without Recourse
Washington Mutual Bank

Cynthia A. Riley, Vice-President



This page is part of your document - DO NOT DISCARD





**20072017562** Pages: 009





Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

08/29/07 AT 08:53AM

Fee: 34.00
Tax: 0.00
Other: 0.00
_____
Total: 34.00

1092122      200708290040009   Mail

# TITLE(S) :



L E A D    S H E E T

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.     Number of AIN's Shown

THIS FORM IS NOT TO BE DUPLICATED



**EXHIBIT B**

Recording requested by and
**When Recorded Mail to:**
Optima Information Solutions
3 First American Way
Santa Ana, CA 92707
WAMU

ONS

08/29/07



20072017562

 **Washington Mutual**

**WaMu Equity Plus™**
**DEED OF TRUST**
Loan Number: ████4775

THIS DEED OF TRUST is between:
NOOR NORRIS AND HELY J. NORRIS

whose address is:
20358 VIA SANSOVINO  PORTER RANCH, CA 91326-4409
("Trustor");     CALIFORNIA RECONVEYANCE COMPANY     , a     CALIFORNIA
corporation, the address of which is:
9200 OAKDALE AVENUE  CHATSWORTH, CA 91311
and its successors in trust and assigns ("Trustee"); and
WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION, WHICH IS ORGANIZED AND
EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND WHOSE ADDRESS IS
2273 N GREEN VALLEY PARKWAY, SUITE #14, HENDERSON, NV  89014 ("BENEFICIARY") AND
ITS SUCCESSORS OR ASSIGNS.

   1.  **Granting Clause.**  Trustor hereby grants, bargains, sells and conveys to Trustee in
trust, with power of sale, the real property in _____ LOS ANGELES _____ County, California,
described below and all interest in it Trustor ever gets:
SHOWN  ON  EXHIBIT  "A"  ATTACHED  HERETO  AND  MADE  A  PART  HEREOF  BY  THIS
REFERENCE.

Tax  Parcel  Number:_____ 2701-061-024 _____ together  with  all
insurance  and  condemnation  proceeds  related  to  it;  all  plumbing,  lighting,  air  conditioning  and
heating  apparatus  and  equipment;  and  all  fencing,  blinds,  drapes,  floor  coverings,  built-in

4 3 6 0 (01/24/07) w8.2

Page 1 of 7

**EXHIBIT B**



4775

appliances and other fixtures at any time installed  on or in or used in connection with such real property.

All of the property described above will be called the "Property". As used herein "State" shall refer to the state of California.

2.   **Obligation Secured.** This Deed of Trust is given to secure performance of each promise of Trustor contained herein and in a _____ WaMu Equity Plus(TM) _____ Agreement and Disclosure with Beneficiary of even date herewith with a maximum credit limit of _____ $423,000.00 _____ (the "Credit Agreement"), including any extensions, renewals or modifications thereof, and repayment of all sums borrowed by Trustor under the Credit Agreement, with interest from the date of each advance until paid at the rates provided therein. The Credit Agreement provides for variable and fixed rates of interest. Under the Credit Agreement, the Trustor may borrow, repay and re-borrow from time to time, up to the maximum credit limit stated above, and all such advances shall be secured by the lien of this Deed of Trust. This Deed of Trust also secures payment of certain fees and charges payable by Trustor under the Credit Agreement, certain fees and costs of Beneficiary as provided in Section 9 of this Deed of Trust, and repayment of money advanced by Beneficiary to protect the Property or Beneficiary's interest in the Property, including advances made pursuant to Section 6 below. The Credit Agreement provides that unless sooner repaid, all amounts due under the Credit Agreement are due and payable in full thirty (30) years from the date of this Deed of Trust (the "Maturity Date"). All amounts due under the Credit Agreement and this Deed of Trust are called the "Debt".

3.   **Representations of Trustor.** Trustor represents that:
(a)   Trustor is the owner of the Property, which is unencumbered except by: easements, reservations, and restrictions of record not inconsistent with the intended use of the Property and any existing first mortgage or deed of trust given in good faith and for value, the existence of which has been disclosed in writing to Beneficiary; and
(b)   The Property is not presently and will not during the term of this Deed of Trust be used for any agricultural purposes.

4.   **Promises of Trustor.** Trustor promises:
(a)   To keep the Property in good repair and not to remove, alter or demolish any of the improvements on the Property, without first obtaining Beneficiary's written consent;
(b)   To allow representatives of Beneficiary to inspect the Property at any reasonable hour, and to comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property;
(c)   To pay on time all lawful taxes and assessments on the Property;
(d)   To perform on time all terms, covenants and conditions of any prior mortgage or deed of trust covering the Property or any part of it and pay all amounts due and owing thereunder in a timely manner;
(e)   To see to it that this Deed of Trust remains a valid lien on the Property superior to all liens except those described in Section 3(a), and to keep the Property free of all encumbrances which may impair Beneficiary's security;
(f)   To keep the improvements on the Property insured by a company satisfactory to Beneficiary against fire and extended coverage perils, and against such other risks as Beneficiary may reasonably require, in an amount equal to the full insurable value of the improvements, and to deliver evidence of such insurance coverage to Beneficiary. Subject to the rights of the holder of any lien described in 3(a), Beneficiary shall be named as the loss payee on all such policies pursuant to a standard lender's loss payable clause. The amount collected under any insurance policy shall

**EXHIBIT B**

4775

be applied to the repair of such improvements, unless doing so would impair Beneficiary's security, in which event such proceeds may be applied upon any indebtedness hereby secured. In the event of foreclosure or sale of the Property pursuant to the Trustee's power of sale, all rights of the Trustor in insurance policies then in force shall pass to the purchaser at the Sheriff's or Trustee's sale.

    (g)  To sign all financing statements and other documents that Beneficiary may request from time to time to perfect, protect and continue Beneficiary's security interest in the Property. Trustor irrevocably appoints Beneficiary as Grantor's attorney-in-fact to execute, file and record any financing statements or similar documents in Trustor's name and to execute all documents necessary to transfer title if there is a default; and

    (h)  To advise Beneficiary immediately in writing of any change in Trustor's name, address or employment.

    **5.  Sale, Transfer or Further Encumbrance of Property.**  Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Trustor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

    **6.  Curing of Defaults.**  If Trustor fails to comply with any of the covenants in Section 4, including all the terms of any prior mortgage or deed of trust, Beneficiary may take any action required to comply with any such covenants without waiving any other right or remedy it may have for Trustor's failure to comply. Repayment to Beneficiary of all the money spent by Beneficiary on behalf of Trustor shall be secured by this Deed of Trust; at Beneficiaries option, advance may be made against the Credit Agreement to pay amounts due hereunder; such shall not relieve Beneficiary from liability for failure to fulfill the covenants in Section 4. The amount spent shall bear interest at the rates from time to time applicable under the Credit Agreement and be repayable by Trustor on demand. Although Beneficiary may take action under this paragraph, Beneficiary is not obligated to do so.

    **7.  Remedies For Default.**

    (a)  Prompt performance under this Deed of Trust is essential. If Trustor does not pay any installment of the Debt or other amount due hereunder on time, or any other event occurs that entitles Beneficiary to declare the unpaid balance of the Debt due and payable in full under the Credit Agreement, or if Trustor fails to comply with any other term, condition, obligation or covenant contained in the Credit Agreement or this Deed of Trust or any rider thereto, or any other deed of trust, mortgage, trust indenture or security agreement or other instrument having priority over this Deed of Trust, or if any representation of Trustor herein was false or misleading, the Debt and any other money whose repayment is secured by this Deed of Trust shall immediately become due and payable in full, at the option of Beneficiary, and the total amount owed by Trustor shall thereafter bear interest at the rate(s) stated in the Credit Agreement. Beneficiary may then or thereafter advise Trustee of the default and of Beneficiary's election to have the Property sold pursuant to Trustee's power of sale in accordance with applicable law and deliver to Trustee any documentation as may be required by law. After giving any notices and the time required by applicable law, Trustee shall sell the Property, either in whole or in separate parcels or other part, and in such order as Trustee may choose, at public auction to the highest bidder for cash in lawful money of the United States which will be payable at the time of sale all in accordance with applicable law. Anything in the preceding sentence to the contrary notwithstanding, Beneficiary may apply the Debt towards any bid at any such sale. Trustee may postpone any such sale by providing such notice as may be required by law. Unless prohibited by law, any person, including the Trustor, Beneficiary or Trustee, may purchase at any such sale. Trustee shall apply the

**EXHIBIT B**

4775

proceeds of the sale as follows: (i) to the expenses of the sale, including a reasonable trustee's fee and lawyer's fee; (ii) to the obligations secured by this Deed of Trust; and, (iii) the surplus, if any, shall go to the person(s) legally entitled thereto.

     (b)   Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the Property which Trustor had or had the power to convey at the time of execution of this Deed of Trust and any interest which Trustor subsequently acquired. The Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust. This recital shall be prima facie evidence of such compliance and conclusive evidence of such compliance in favor of bona fide purchasers and encumbrancers for value.

     (c)   To the extent permitted by law the power of sale conferred by this Deed of Trust is not an exclusive remedy. In connection with any portion of the Property which is personal property, Beneficiary shall further be entitled to exercise the rights of a secured party under the Uniform Commercial Code as then in effect in the state of California.

     (d)   By accepting payment of any sum secured by this Deed of Trust after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

     **8.   Condemnation; Eminent Domain.** In the event any portion of the Property is taken or damaged in an eminent domain proceeding, the entire amount of the award, or such portion as may be necessary to fully satisfy the Debt, shall, except as required by applicable law, be paid to the Debt.

     **9.   Fees and Costs.** Trustor shall pay Beneficiary's and Trustee's reasonable cost of searching records, other reasonable expenses as allowed by law, and reasonable attorney's fees, in any lawsuit or other proceeding to foreclose this Deed of Trust; in any lawsuit or proceeding which Beneficiary or Trustee prosecutes or defends to protect the lien of this Deed of Trust; and, in any other action taken by Beneficiary to collect the Debt, including without limitation any disposition of the Property under the State Uniform Commercial Code; and, any action taken in bankruptcy proceedings as well as any appellate proceedings.

     **10.   Reconveyance.** Trustee shall reconvey the Property to the person entitled thereto, on written request of Beneficiary, or following satisfaction of the obligations secured hereby and Beneficiary and Trustee shall be entitled to charge Trustor a reconveyance fee together with fees for the recordation of the reconveyance documents unless prohibited by law. If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or reconveyance of your security instrument for a reasonable period of time to enable us to post to your Credit Line Account any advances that you have received.

     **11.   Trustee; Successor Trustee.** Beneficiary may, unless prohibited by law, appoint a successor Trustee from time to time in the manner provided by law. The successor Trustee shall be vested with all powers of the original trustee. The Trustee is not obligated to notify any party hereto of a pending sale under any other deed of trust or of any action or proceeding in which Trustor, Trustee or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

     **12.   Savings Clause.** If a law, which applies to this Deed of Trust or the Credit Agreement and which sets maximum loan charges, is finally interpreted by a court having jurisdiction so that the interest or other loan charges collected or to be collected in connection with this Deed of Trust or the Credit Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already

4 3 6 0 (01/24/07) w8.2

Page 4 of 7

**EXHIBIT B**



4775

collected from Trustor which exceeded permitted limits will be refunded to Trustor. Beneficiary may choose to make this refund by reducing the principal owed or by making a direct payment. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**13. Miscellaneous.** This Deed of Trust shall benefit and obligate the heirs, devisees, legatees, administrators, executors, successors, and assigns of the parties hereto. The term "Beneficiary" shall mean the holder and owner of the Credit Agreement secured by this Deed of Trust, whether or not that person is named as Beneficiary herein. The words used in this Deed of Trust referring to one (1) person shall be read to refer to more than one (1) person if two (2) or more have signed this Deed of Trust or become responsible for doing the things this Deed of Trust requires. This Deed of Trust shall be governed by and construed in accordance with Federal law and, to the extent Federal law doesn't apply, the laws of the state of California. If any provision of this Deed of Trust is determined to be invalid under law, the remaining provisions of this Deed of Trust shall nonetheless remain in full force and effect.

**14. Beneficiary and Similar Statements.** Beneficiary may collect a fee in the maximum amount allowed by law for furnishing any beneficiary statement, payoff demand statement or similar statement.

**15. Riders.** If one (1) or more riders are executed by Trustor and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Condominium Rider ☐ Other: _____
                                                  (specify)
☐ Planned Unit Development Rider

**EXHIBIT B**

4775

By signing below Trustor accepts and agrees to the provisions of this Deed of Trust and of any rider(s) executed by Trustor concurrently therewith.

DATED at _Los Angelos California_ this _26th_ day of _July_ , _2007_.

TRUSTOR(S):

_____
NOOR NORRIS

_____
HELY J. NORRIS

4 3 6 0 (01/24/07) w8.2

Page 6 of 7

**EXHIBIT B**

8

████4775

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On _7-26-2007_ before me, _RITA BEDOYAN_, Notary Public,
personally appeared _(here insert name)_
NOOR NORRIS
HELY J. NORRIS

_____

_____

_____

_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature: _____

My Commission expires: _Feb, 27, 2009_
My Commission number: _1555323_

(Seal or Stamp)

RITA BEDOYAN
Commission # 1555323
Notary Public - California
Los Angeles County
My Comm. Expires Feb 27, 2009

## REQUEST FOR FULL RECONVEYANCE
Do not record. To be used only when Trustor's
indebtedness has been repaid and Credit Agreement cancelled.

TO: TRUSTEE _____

The undersigned is Trustee of the within Deed of Trust, and the legal owner and holder of the
___WaMu Equity Plus(TM)___ Agreement secured thereby. Said Deed of Trust is hereby surrendered
to you for reconveyance and you are requested, upon payment of all sums owing to you, to
reconvey, without warranty, to the person(s) entitled thereto, the right, title and interest now held
by you thereunder.

DATE: _____

WASHINGTON MUTUAL BANK _____

By _____

Its _____

4 3 6 0 (01/24/07) w8.2                                    Page 7 of 7

**EXHIBIT B**

9

4775

## EXHIBIT "A"
## ATTACHMENT TO SECURITY INSTRUMENT

THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE CITY OF LOS
ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED
AS FOLLOWS:
PARCEL 1:
LOT 129 OF TRACT NO. 45297, IN THE CITY OF LOS ANGELES, COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK
1269 PAGES 53 TO 68 INCLUSIVE, OF MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY.
PARCEL 2:
NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, MAINTENANCE,
REPAIR, DRAINAGE, ENCROACHMENT, SUPPORT, AND FOR OTHER PURPOSES,
ALL AS DESCRIBED IN THE DECLARATION OF COVENANTS, CONDITIONS AND
RESTRICTIONS AND RESERVATION OF EASEMENTS FOR THE RENAISSANCE,
RECORDED ON MAY 19, 1999, AS INSTRUMENT NO. 99-903984 AND ANY
AND ALL AMENDMENTS THERETO ('DECLARATION'), AND THE SUPPLEMENTAL
DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND
RESERVATION OF EASEMENTS ('SUPPLEMENTAL DECLARATION') FOR PHASE
23 OF THE RENAISSANCE, RECORDED ON MARCH 15, 2004, AS INSTRUMENT
NO. 04-0608949, ALL RECORDED IN OFFICIAL RECORDS OF LOS ANGELES
COUNTY, CALIFORNIA.

**EXHIBIT B**

CHRISTOPHER M. MCDERMOTT (SBN 253411)
cmcdermott@piteduncan.com
TODD S. GARAN (CA SBN 236878)
tgaran@piteduncan.com
**PITE DUNCAN, LLP**
4375 Jutland Dr., Ste. 200
P.O. Box 19734
San Diego, CA 92177-9734
Telephone: (858) 750-7600
Facsimile: (619) 590-1385

Attorneys for: JP Morgan Chase Bank, N.A. ("**Creditor**")

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA –SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re | 1:11-bk-18591-VK |
| NOOR NORRIS and HELY NORRIS, | Chapter 11 |
| Debtor and Debtor in Possession. | **DECLARATION OF JONATHAN K GOLDRICH IN SUPPORT OF CREDITOR'S OBJECTION TO DISCLOSURE STATEMENT** |
| | [*Docket Number 270*] |
| | <u>Subject Property</u>:<br>20358 Via Sansovino,<br>Northridge, CA 91326 |
| | Date:      November 6, 2014<br>Time:      1:00 p.m.<br>Rm:        301<br>              21041 Burbank Blvd.<br>              Woodland Hills, CA 91364<br>Judge:    Hon. Victoria S. Kaufman |

I, Jonathan K. Goldrich, declare:

1.      I am over 18 years of age and I have personal knowledge of the matters set forth in this declaration and related attachments, if called upon to testify, I could and would competently testify thereto.

2.      I am a certified real estate appraiser duly licensed by the State of California, license Number AR040070.

- 1 -

**Declaration in Support of Creditor's Objection to Disclosure Statement**

**EXHIBIT C**

3.      I am the owner and/or principal of Goldrich Real Estate Services located at 14431 Ventura Blvd., Suite 620, Sherman Oaks, CA 91423.

4.      On or about January 7, 2014 I personally conducted an interior and exterior inspection of the real property located at 20358 Via Sansovino, Northridge, CA 91326 ("**Subject Property**").

5.      Based upon my inspection, I have prepared an Appraisal report ("**Appraisal**") concerning the Subject Property and the valuation thereof.  Attached hereto as Exhibit 1 and incorporated herein by this reference is a true and correct copy of the Appraisal that I prepared for the Subject Property.

6.      As a licensed real estate appraiser, I am qualified to conduct property evaluations and I am familiar with real estate values in the area surrounding the Subject Property. In the course of conducting my inspection, evaluation and preparing the attached Appraisal, I followed the practices and procedures required by my profession in determining the value of the Subject Property.

7.      Based upon my experience, complete inspection of the Subject Property, related research and analysis, and the assumptions set forth in the Appraisal attached hereto, it is my professional opinion that the market value of the Subject Property as of January 7, 2014 is $1,350,000.00.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on October 22, 2014, at Sherman Oaks, California.

_____
JONATHAN K. GOLDRICH

- 2 -

**Declaration in Support of Creditor's Objection to Disclosure Statement**

**EXHIBIT C**

# Uniform Residential Appraisal Report

File # 130594

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address 20358 Via Sansovino | City Northridge | State CA | Zip Code 91326 |

| | |
|---|---|
| Borrower NA | Owner of Public Record NORRIS NOOR & HELY J | County Los Angeles |

Legal Description TR=45297 LOT 129

| Assessor's Parcel # 2701-061-024 | Tax Year 2013 | R.E. Taxes $ 14,087 |
|---|---|---|

| Neighborhood Name Renaissance | Map Reference 31084 | Census Tract 1082.02 |
|---|---|---|

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $ 0    ☒ PUD    HOA $ 261 ☐ per year ☒ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Estimate of Market Value

Lender/Client Pite Duncan, LLP    Address 4375 Jutland Drive, Suite 200, San Diego, CA 92117

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).    MLS.

**CONTRACT**

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE | AGE | One-Unit | 70 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $ (000) | (yrs) | 2-4 Unit | 5 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | | | 480 Low | 3 | Multi-Family | 10 % |
| Neighborhood Boundaries Oat Mountain to the north and to the west; 118 freeway to the south;Palisades | | | | | | 1,485 High | 27 | Commercial | 15 % |
| Park to the east. | | | | | | 980 Pred. | 14 | Other | % |

Neighborhood Description The subject is located in the Renaissance Community in the Porter Ranch neighborhood within Los Angeles County. The neighborhood consists of primarily single-family and multi-family residences which vary in size, quality and condition. Commercial uses limited and proximity to neighborhood services and conveniences good for area. Access to employment outside area via 5/118/405 freeways. Good market appeal.

Market Conditions (including support for the above conclusions)    See market conditions addendum

**SITE**

| Dimensions See LACTA Plat Map | Area 11,748 sf | Shape Rectangular | View B;CtySky;Mtn |
|---|---|---|---|

Specific Zoning Classification RE11, City of LA    Zoning Description Residential Estate, minimum 11,000 sf site area.

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | ☐ |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | ☐ | ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No    FEMA Flood Zone X    FEMA Map # 06037C1040F    FEMA Map Date 09/26/2008

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | Foundation Walls | Concrete/Good | Floors | Carpet/Tile/Good |
| # of Stories 2 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | Stucco/Good | Walls | Painted/Wd/Good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 0 sq.ft. | | Roof Surface | Concrete Tile/Good | Trim/Finish | Painted/Good |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish 0 % | | Gutters & Downspouts | Aluminum/Good | Bath Floor | Tile/Good |
| Design (Style) Mediterranean | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | VinylCsmnt/Good | Bath Wainscot | Tile/Good |
| Year Built 2004 | | Evidence of ☐ Infestation | | Storm Sash/Insulated | Unknown | Car Storage | ☒ None |
| Effective Age (Yrs) 10 | | ☐ Dampness ☐ Settlement | | Screens | Yes/Good | ☒ Driveway # of Cars 3 |
| Attic ☒ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | | Driveway Surface Concrete |
| ☐ Drop Stair ☐ Stairs | | ☐ Other Fuel Gas | | ☒ Fireplace(s) # 4 ☒ Fence 1 | | ☒ Garage # of Cars 3 |
| ☐ Floor ☐ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck 1 ☐ Porch None | | ☐ Carport # of Cars 0 |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☒ Pool 1 ☒ Other Spa | | ☒ Att. ☐ Det. ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area **above** grade contains: 9 Rooms    4 Bedrooms    4.1 Bath(s)    5,208 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).    None noted.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).    C3;No updates in the prior 15 years;C3;No updates in the prior 15 years;At the time of the inspection, all utilities were turned on and working(i.e., water, gas and electricity.)  The Spa is broken per homeowner.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

## Uniform Residential Appraisal Report

File # 130594

There are __3__ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 1,124,999 to $ 1,399,000 .

There are __13__ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 900,000 to $ 1,485,000 .

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 20358 Via Sansovino Northridge, CA 91326 | 19863 Falcon Crest Way Northridge, CA 91326 | | 20137 Via Medici Northridge, CA 91326 | | 20239 Via Madrigal Northridge, CA 91326 | |
| Proximity to Subject | | 0.77 miles SE | | 0.32 miles E | | 0.20 miles E | |
| Sale Price | $ | | 900,000 | | 1,285,000 | | 1,485,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 223.99 sq.ft. | | $ 272.19 sq.ft. | | $ 285.03 sq.ft. | |
| Data Source(s) | | MRIS#OC13162514MR;DOM 79 | | MRIS#13009272VC;DOM 78 | | MRIS# SR13058965CN;DOM 103 | |
| Verification Source(s) | | Realquest,LACTA, MLS | | Realquest,LACTA, MLS | | Realquest,LACTA, MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Short Conv;0 | +90,000 | ArmLth Conv;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s11/13;c11/13 | | s09/13;c09/13 | | s07/13;c07/13 | |
| Location | N;Renaissance; | A;Porter Ranch | +25,000 | N;Renaissance; | | N;Renaissance; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 11,748 sf | 16,432 sf | -9,368 | 11,478 sf | 0 | 11,364 sf | 0 |
| View | B;CtySky;Mtn | N;Res; | +10,000 | N;Res; | +10,000 | N;Res; | +10,000 |
| Design (Style) | DT2;Mediterrane | DT2;Traditional | 0 | DT2;Mediterrane | | DT2;Mediterrane | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 10 | 16 | 0 | 14 | 0 | 4 | -15,000 |
| Condition | C3 | C4 | +90,000 | C3 | | C2 | -90,000 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | -15,000 | Total Bdrms. Baths | -15,000 |
| Room Count | 9 4 4.1 | 8 4 4.0 | +5,000 | 9 5 5.1 | -10,000 | 9 5 5.0 | -5,000 |
| Gross Living Area | 5,208 sq.ft. | 4,018 sq.ft. | +107,100 | 4,721 sq.ft. | +43,800 | 5,210 sq.ft. | 0 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | FAU/CAC | FAU/CAC | | FAU/CAC | | FAU/CAC | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 3ga3dw | 3ga3dw | | 3ga3dw | | 3ga3dw | |
| Porch/Patio/Deck | Patio | Patio | | Patio | | Patio | |
| Pool/Spa, F/P | Pool/Spa, 4 F/P | None, 2 F/P | +55,000 | None, 2 F/P | +55,000 | Pool/Spa, 3 F/P | +2,500 |
| Other | None | Bonus | +25,000 | None | | None | |
| Net Adjustment (Total) | | ☒ + ☐ - $ | 397,732 | ☒ + ☐ - $ | 83,800 | ☐ + ☒ - $ | -112,500 |
| Adjusted Sale Price of Comparables | | Net Adj. 44.2 % Gross Adj. 46.3 % $ | 1,297,732 | Net Adj. 6.5 % Gross Adj. 10.4 % $ | 1,368,800 | Net Adj. 7.6 % Gross Adj. 9.3 % $ | 1,372,500 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s)   NDC Data, FARES, Fidelity, LACTA and MLS. The effective date of the appraisal is January 7, 2014.

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data Source(s)   NDC Data, FARES, Fidelity, LACTA and MLS. The effective date of the appraisal is January 7, 2014.

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Doc. 2375168 | Doc. 2148777 | Doc. 666206 | Doc. 949783 |
| Effective Date of Data Source(s) | 01/07/2014 | 01/07/2014 | 01/07/2014 | 01/07/2014 |

Analysis of prior sale or transfer history of the subject property and comparable sales   There have been no other prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal or of the comparable sales one year prior to the effective date of this appraisal per MLS, FARES and public records.

Summary of Sales Comparison Approach   See addendum.

Indicated Value by Sales Comparison Approach $  1,350,000

Indicated Value by: Sales Comparison Approach $  1,350,000   Cost Approach (if developed) $  1,350,235   Income Approach (if developed) $  0

See addendum.

This appraisal is made ☒ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,  ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  Personal property items were not considered.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  1,350,000  , as of  01/07/2014  , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005                UAD Version 9/2011    Page 2 of 6                Fannie Mae Form 1004 March 2005

**EXHIBIT C**

## Uniform Residential Appraisal Report

File # 130594

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 20358 Via Sansovino Northridge, CA 91326 | 20274 Via Medici Northridge, CA 91326 | | 20253 Via Galileo Northridge, CA 91326 | | 20365 Via Galileo Northridge, CA 91326 | |
| Proximity to Subject | | 0.21 miles SE | | 0.15 miles SE | | 0.03 miles S | |
| Sale Price | $ | $ 1,338,000 | | $ 1,300,000 | | $ 1,184,000 | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 284.32 sq.ft. | | $ 275.37 sq.ft. | | $ 299.90 sq.ft. | |
| Data Source(s) | | MRIS#SR13119072CN;DOM 60 | | MRIS#SR13206735CN;DOM 96 | | MRIS#SR13184777CN;DOM 92 | |
| Verification Source(s) | | Realquest,LACTA, MLS | | Realquest,LACTA, MLS | | Realquest,LACTA, MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | Listing | | Listing | |
| Concessions | | Conv;0 | | | | | |
| Date of Sale/Time | | s08/13;c08/13 | | Active | | Active | |
| Location | N;Renaissance; | N;Renaissance; | | N;Renaissance; | | N;Renaissance; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 11,748 sf | 11,015 sf | 0 | 12,117 sf | 0 | 15,259 sf | -7,022 |
| View | B;CtySky;Mtn | B;CtySky;Mtn | | N;Res; | +10,000 | N;Res; | +10,000 |
| Design (Style) | DT2;Mediterrane | DT2;Mediterrane | | DT2;Mediterrane | | DT2;Mediterrane | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 10 | 12 | 0 | 11 | 0 | 10 | |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | -15,000 | Total Bdrms. Baths | -10,000 | Total Bdrms. Baths | -15,000 |
| Room Count | 9 4 4.1 | 9 5 5.0 | -5,000 | 9 5 6.0 | -15,000 | 9 5 5.0 | -5,000 |
| Gross Living Area | 5,208 sq.ft. | 4,706 sq.ft. | +45,200 | 4,721 sq.ft. | +43,800 | 3,948 sq.ft. | +113,400 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | FAU/CAC | FAU/CAC | | FAU/CAC | | FAU/CAC | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 3ga3dw | 3ga3dw | | 3ga3dw | | 3ga3dw | |
| Porch/Patio/Deck | Patio | Patio | | Patio | | Patio | |
| Pool/Spa, F/P | Pool/Spa, 4 F/P | Pool/Spa, 2 F/P | +5,000 | Pool/Spa, 2 F/P | +5,000 | Pool/Spa, 1 F/P | +7,500 |
| Other | None | None | | None | | None | |
| Net Adjustment (Total) | | ☒ + ☐ - $ | 30,200 | ☒ + ☐ - $ | 33,800 | ☒ + ☐ - $ | 103,878 |
| Adjusted Sale Price | | Net Adj. 2.3 % | | Net Adj. 2.6 % | | Net Adj. 8.8 % | |
| of Comparables | | Gross Adj. 5.2 % $ | 1,368,200 | Gross Adj. 6.4 % $ | 1,333,800 | Gross Adj. 13.3 % $ | 1,287,878 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Doc. 2375168 | Doc. 769315 | Doc. 1374873 | Doc.925736 |
| Effective Date of Data Source(s) | 01/07/2014 | 01/07/2014 | 01/07/2014 | 01/07/2014 |

Analysis of prior sale or transfer history of the subject property and comparable sales    There have been no other prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal or of the comparable sales one year prior to the effective date of this appraisal per MLS, FARES and public records.

Analysis/Comments    See addendum.

SALES COMPARISON APPROACH

SALE HISTORY

ANALYSIS/ COMMENTS

EXHIBIT C

# Uniform Residential Appraisal Report

File # 130594

See addendum

**ADDITIONAL COMMENTS**

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Due to the lack of available land sales, the allocation method was used to estimate the site value.  The land value represents approximately 19.3% of total value through the Cost Approach, which is not uncommon for this area of Porter Ranch. The $100,000 represents cost associated with the fence, pool/spa, driveway, and exterior landscaping.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ | 260,000 |
|---|---|---|---|---|---|
| Source of cost data    Marshall and Swift Valuation | DWELLING | 5,208 Sq.Ft. @ $ | 200.00 | =$ | 1,041,600 |
| Quality rating from cost service    Good    Effective date of cost data    Jan 2014 | | 0 Sq.Ft. @ $ | | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | E.I.@20% of costs | | | =$ | 108,030 |
| Replacement cost estimates were derived from Marshall and Swift | Garage/Carport | 860 Sq.Ft. @ $ | 45.00 | =$ | 38,700 |
| Valuation and were supplemented by the appraiser's knowledge of such | Total Estimate of Cost-New | | | =$ | 1,188,330 |
| costs in the subject's market area. Site value was derived by extraction | Depreciation | 198,095 | Functional | External | |
| method due to the lack of vacant land sales in the area. The | Physical | | | =$( | 198,095) |
| land:Improvement ratio is typical for the area. | Depreciated Cost of Improvements | | | =$ | 990,235 |
| | "As-is" Value of Site Improvements | | | =$ | 100,000 |
| Estimated Remaining Economic Life (HUD and VA only)    50 Years | INDICATED VALUE BY COST APPROACH | | | =$ | 1,350,235 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $    0    X Gross Rent Multiplier    0    = $    0    Indicated Value by Income Approach | |
|---|---|

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?    ☐ Yes  ☒ No    Unit type(s)  ☒ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

Total number of phases    Total number of units    Total number of units sold

Total number of units rented    Total number of units for sale    Data source(s)

Was the project created by the conversion of existing building(s) into a PUD?    ☐ Yes    ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?    ☐ Yes    ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?    ☐ Yes    ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?    ☐ Yes    ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

## Uniform Residential Appraisal Report

File # 130594

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK:    The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE:    The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER:    The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE:    The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:    The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

## Uniform Residential Appraisal Report

File # 130594

**APPRAISER'S CERTIFICATION:**    The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

## Uniform Residential Appraisal Report

File # 130594

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:        The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature   Jonathan Goldrich | Signature |
| Name   Jonathan Goldrich | Name |
| Company Name   Goldrich Real Estate Services | Company Name |
| Company Address   14431 Ventura Boulevard | Company Address |
| Sherman Oaks, CA 91423 | |
| Telephone Number   (818)606-9244 | Telephone Number |
| Email Address   jonathan.goldrich@gmail.com | Email Address |
| Date of Signature and Report   01/14/2014 | Date of Signature |
| Effective Date of Appraisal   01/07/2014 | State Certification # |
| State Certification #   AR040070 | or State License # |
| or State License # | State |
| or Other (describe)            State # | Expiration Date of Certification or License |
| State   CA | |
| Expiration Date of Certification or License   04/19/2014 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED

20358 Via Sansovino

Northridge, CA 91326

APPRAISED VALUE OF SUBJECT PROPERTY $        1,350,000

LENDER/CLIENT

Name   Attn: Pite Duncan, LLP

Company Name   Pite Duncan, LLP

Company Address   4375 Jutland Drive, Suite 200, San Diego, CA

92117

Email Address

SUBJECT PROPERTY

☐ Did not inspect subject property

☐ Did inspect exterior of subject property from street

    Date of Inspection

☐ Did inspect interior and exterior of subject property

    Date of Inspection

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street

☐ Did inspect exterior of comparable sales from street

    Date of Inspection

**EXHIBIT C**

# Market Conditions Addendum to the Appraisal Report

File No. 130594

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address **20358 Via Sansovino**   City **Northridge**   State **CA**   ZIP Code **91326**

Borrower **NA**

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

**MARKET RESEARCH & ANALYSIS**

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 8 | 4 | 1 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Absorption Rate (Total Sales/Months) | 1.33 | 1.33 | .33 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Total # of Comparable Active Listings | 0 | 2 | 3 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 0 | 1.5 | 9.1 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | 1,105,000 | 1,311,500 | 900,000 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Median Comparable Sales Days on Market | 34 | 60 | 79 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | 0 | 1,349,000 | 1,299,000 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Median Comparable Listings Days on Market | 0 | 135 | 120 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 94.92% | 103.66% | 100.00% | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | | ☐ Yes | ☒ No | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).       Data from our analysis of single residences listed on the MLS in the subject's market area cannot produce reliable data.

Based on discussions with real estate agents active in the subject market's area, seller concessions are not considered common for condominium residence property transactions within the area.  Demand for housing in this area is consistent with competing areas. Conventional financing available to borrowers based on traditional underwriting criteria, as opposed to expansive lending practices common in the 2002-2005 that contributed to the ongoing Credit Crisis.

Are foreclosure sales (REO sales) a factor in the market?    ☐ Yes   ☒ No    If yes, explain (including the trends in listings and sales of foreclosed properties).

An analysis of the MLS reviewed closed sales over the past 6 months, as well as current listings within the subject's market area.  My analysis indicated approximately 27 properties; 3 of these sales were designated as an REO or foreclosure sale which equates to 117% of all sales.  This does not indicate a prevalence of REO activity in the area, and as a result, REO sales are not specifically deemed necessary to include in the analysis as they do not reflect current market conditions.

Cite data sources for above information.      MLS and Public Records.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

Supply & Demand in balance. Review of the MLS found 8 active listings of single-family residences currently on the market, ranging from $699,000  to $1,399,000.  A statistical report was generated for single-family residences sales in the subject's market area on the MLS:
- From 01/07/2013 - 07/07/2013, the median single-family residence  was  $940,000
- From 07/07/2013 - 01/07/2014, the median single-family residence  was  $962,000
Over the past year, although median comparables have been declining, the market for median single-family residences has increased by 2.3%, or 0.2% monthly.  Based on the above analysis, as well as discussions with real estate agents active in the subject's market area, we have checked stable values for neighborhood single-family residences trends on page 1 of the form.

**CONDO/CO-OP PROJECTS**

If the subject is a unit in a condominium or cooperative project , complete the following:    Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?    ☐ Yes   ☐ No    If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

**APPRAISER**

Signature

Appraiser Name  **Jonathan Goldrich**

Company Name  **Goldrich Real Estate Services**

Company Address  **14431 Ventura Boulevard, Sherman Oaks, CA 9142**

State License/Certification #  **AR040070**    State  **CA**

Email Address  **jonathan.goldrich@gmail.com**

Supervisory Appraiser Name

Company Name

Company Address

State License/Certification #    State

Email Address

Form 1004MC2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

**Supplemental Addendum**

File No. 130594

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |

*I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.*

**Intended User**

The intended user of this report is lender/client. The purpose of the report is  to estimate the current market value of the fee simple interest in the property as of January 7, 2014. The report is not intended for financing purposes and is not intended for third parties.

This appraisal report has been prepared in compliance with the Uniform Appraisal Dataset (UAD) from Fannie Mae and Freddie Mac. The UAD requires the appraiser to use standardized responses that include specific formats, definitions, abbreviations, and acronyms.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties. Some of the standardized responses required by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business. Examples include condition and quality ratings as well as comparable sales and listing data. Not every element of the subject property was viewable and comparable property data was generally obtained from third-party sources (list data sources). Consequently, this information should be considered an "estimate" unless otherwise noted by the appraiser.

**Scope of the Appraisal**

The scope of work included an inspection of the subject, market area and comparable properties, an analysis of local economic and market conditions, and derivation of a value estimate using the Sales Comparison and Cost Approaches to value. This valuation analysis is considered a complete appraisal as defined by the Uniform Standards of Professional Appraisal Practice (USPAP) and is presented in a Summary Report Format.  The appraiser has prepared this appraisal in full compliance with the Home Valuation Code of Conduct and has not performed, participated in, or been associated with any activity in violation of the code.

The appraiser is not an environmental inspector. The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended.

The appraiser is not a home inspector. This report should not be relied upon to disclose any conditions present in the subject property. The appraisal report does not guarantee that the property is free of defects. A professional home inspection is recommended.

**Property Rights Appraised**

The property rights appraised are the fee simple interest in the subject. *The Dictionary of Real Estate Appraisal (4th edition)* defines a fee simple estate as:

*Absolute ownership unencumbered by any other interest or estate subject only to the limitations imposed by the government powers of taxation, eminent domain, police power, and escheat.*

**Selection of Comparable Sales/Deviation From Appraisal Guidelines**

Verification sources for information of the comparable sales within this report are based upon an analysis of public records, an exterior inspection of the properties, and an analysis of the MLS based on pending, expired, cancelled and previously sold listings of their respective properties. Our search for comparable sales included FARES, LACTA, the MLS, and interviews with real estate brokers active in the area.

Our search for comparable sales included sales within 1 mile, 25% of the subject's gla, bracketed within the subject's site area, subject's market area of PUDS in Northridge/Porter Ranch 91326 and within 6 months of the effective date of this appraisal.  We were successful.  We used six closed sales and two active listings, all of which are located within 0.77 miles of the subject.  All closed sales are within five months. We initially considered a much larger set of sales located in the subject's market area. This list was narrowed down by a combination of MLS information and exterior inspections.  The six sales included in this report are the most similar to the subject in terms of location, gla, site area, condition and design and appeal.

Appraisal guidelines specify that net adjustments should not exceed 15%, gross adjustments should not exceed 25%, and individual adjustments should not exceed 10%. However, due to the lack of comparable sales in the subject's market area of similar location, design,  and condition, we were unable to stay within these guidelines

Comp 1 required 44.2% net and 46.3% gross adjustments, and an individual adjustment that exceeded 10% of its sale price.

The six sales used in my analysis are considered to be the best available sales for direct comparison with the subject.

**EXHIBIT C**


**Supplemental Addendum**

File No. 130594

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |

## Comments on the Sales Comparison Approach

The Sales Comparison Approach is a method of estimating the market value of a subject property through an analysis of sales of similar properties. Sometimes referred to as the Market Data Approach, this method assumes that sales of comparable properties, having similar physical and area data attributes, provide a range of value for the subject. The credibility of this approach depends upon the accuracy of the data collected, as well as the degree of comparability between each sale property and the subject property.

Details of the transactions we selected are believed to be reliable. The comparable properties exist in the same neighborhood as the subject, and represent comparable investment alternatives.

## Adjustments in the Sales Comparison Approach

**Date of Sale:** Due to stabilizing prices in the subject's neighborhood we not have applied date of sale adjustments. However, Comps 1 and 5, both short sales were adjusted 10% upward from their sale price. Active listings for less than 30 days on the market received not a adjustments. Comp 6, an active listings on the market for more than 90 days was adjusted downward 5% to account for its active sale status.

**Site Area:** Based on a review of Public Records, we used the information from LACTA (Los Angeles County Tax Assessor) to determine that the subject has a site area of 11,748 square feet. Sales which differed from the subject by more than 1,000 square feet were adjusted $2.00 per additional square foot. We use this adjustment because the differences in site area for which we are adjusting consist of land at the back, along the side, or in the sloped portions of the comparable lots. While the comparable lots differ in size from the subject, they still can only be used to build one home, so their larger or smaller site areas are worth only a marginal difference, not the full unit value of land that can accommodate one home.

**View:** The subject has city and mountain views. Comps with residential views were adjusted $10,000 upwards.

**Design and Appeal:** Design and appeal, in this context, relates to the property's curb appeal, exterior condition, property layout, grounds/landscaping and site environs. The subject has good design and appeal. No Design and Appeal adjustments were warranted.

**Age:** Comp 3 was adjusted a modest $15,000 downwards for its four year age.

**Condition:** The subject is in C3, or good condition. Sales in C4 average/inferior condition were adjusted upward $90,000; comps in C2 or very good/superior condition were adjusted $90,000 upwards.   Condition adjustments were based on exterior inspections and MLS information.

**Bedrooms/Bathrooms:** The subject has 4 bedrooms and 4.1 bathrooms. Bathrooms were adjusted at $5,000 per half bathroom and at $15,000 per bedroom, and $10,000 per full bathroom.

**Gross Living Area:** Differences in GLA in excess of 100 square feet were adjusted at $90 per square foot, based on the approximate contributory value.

**Central Air Conditioning:** Comp 2 was adjusted $5,000 downwards for having central air conditioning.

**Parking:** The subject has a two car detached garage. Sales with one car garages were adjusted upward $10,000. Sales with 3 car garages were adjusted downward $10,000.

**Pool/Spa/Fireplace(s):** The subject does not have a pool, but has a fireplace. Sales were adjusted $45,000 per pool, $5,000 per spa, and at $2,500 per fireplace.

**Other:** Comp 1 was adjusted $25,000 downwards for having a bonus room.

## Sales Comparison Approach Conclusion

Four closed sales and two active listing of single-family homes that have occurred in the subject's neighborhood within the last five months are identified in this report and, based on our investigation, are the best transactions for direct comparison with the subject.

Prior to our adjustments, the closed sale comparables ranged from $900,000 to $1,485,000. After our adjustments, the adjusted prices of the closed sale comparables ranged from $1,297,732 to $1,372,500. The active listings were from $1,184,000 to $1,300,000 before the adjustments; afterwards they were from $1,287,878 to $1,333,800. All six comparables are meaningful due to a combination of condition, location, design and appeal,  proximity, lot size and GLA. In addition, all six comparables are located within 0.77 miles of the subject, and represent investment alternatives that a buyer could choose. Due to its location and similar gla to the subject, Comp 3, adjusted respectively at $1,372,500  carried the most weight in our analysis. The other sales carried secondary weight in our analysis. Overall, the subject is best represented by these sales at $1,350,000.

The Subject is above the neighborhood predominant due primarily to a combination of location, design and appeal, condition and gla. This does not represent an over improvement for the subject in its market area, nor does it effect

**EXHIBIT C**

## Supplemental Addendum

File No. 130594

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |

its marketability.

The subject's increase in value is well supported by the comparables used in the report, along with the considerable upgrades to the property since its prior sale.

### Final Reconciliation

The reconciliation involves the correlation of the conclusions reached from the valuation methodologies applied, considering the property type and the requirements of the appraisal assignment. This process depends on the appropriateness and reliability of each approach, and of the quality and reliability of the data obtained. The results from the two approaches are as follows:

| Cost Approach | $1,350,235 |
|---|---|
| Sales Comparison Approach | $1,350,000 |
| Income Capitalization Approach | N/Ap |

In the Cost Approach, cost data was derived from Marshall Valuation Service with local and current multipliers applied to account for location and time adjustments. However, the land value was calculated using an allocation, and is not a reliable indication of site value. Accordingly, we have placed no reliance on this approach in our final analysis. This analysis is included only to provide construction cost bench marks.

The Income Approach is not applicable because the subject is owner-occupied and we are valuing the fee simple interest; the Income Approach produces an indication of the value of leased fee interest.

The Sales Comparison Approach is given the most weight as it best reflects the actions of typical buyers and sellers in this market. There was good market support for the adjustments, as there were several sales in the immediate neighborhood of the subject that have occurred recently.

Based on the work undertaken and our experience as real estate analysts and appraisers, we are of the opinion that the market value of the fee simple estate of the single-family residence located at 20358 Via Sansovino, Northridge CA, as of January , 2013, was $1,350,000.

### Exposure/Marketing Periods

The closed sale comparables have days on market ranging from 60 -103 days. We are of the opinion that a reasonable exposure time period for the subject at $1,350,000, as of the date of value, would be 0 - 90  days. We are of the opinion that the marketing period for the subject would also be 0 - 90 days, as of the date of value.

**EXHIBIT C**

**Subject Photo Page**

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |



### Subject Front

| | |
|---|---|
| 20358 Via Sansovino | |
| Sales Price | |
| Gross Living Area | 5,208 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | N;Renaissance; |
| View | B;CtySky;Mtn |
| Site | 11,748 sf |
| Quality | Q3 |
| Age | 10 |



### Subject Rear



### Subject Street

**EXHIBIT C**

# Photograph Addendum

| Borrower | NA | | | | |
|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | |
| City | Northridge | County | Los Angeles | State | CA   Zip Code   91326 |
| Lender/Client | Pite Duncan, LLP | | | | |



Street Scene 2



Subject Address Verification



Left Side



RIght Side



Pool



Spa

Form PIC6_LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

## Photograph Addendum

| Borrower | NA | | | | |
|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | |



Mountain and City LIght Views



Living Room



Dining Room



Kitchen



Dining Room



Den

Form PIC6_LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

# Photograph Addendum

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |



Office



Bedroom



Laundry



Bathroom



Bathroom



Atrium

**EXHIBIT C**

## Photograph Addendum

| Borrower | NA | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | |



Exercise Room



Master Bedroom



Balcony



Master Sitting Area



Master Bathroom



Master Bathroom

Form PIC6_LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

**Photograph Addendum**

| Borrower | NA | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | |



Bedroom



Bathroom



Bathroom



Bedroom



Bar/Alcove Area

Form PIC6_LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**

## Comparable Photo Page

| | |
|---|---|
| Borrower | NA |
| Property Address | 20358 Via Sansovino |
| City | Northridge |
| County | Los Angeles |
| State | CA |
| Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP |



### Comparable 1

19863 Falcon Crest Way

| | |
|---|---|
| Prox. to Subject | 0.77 miles SE |
| Sale Price | 900,000 |
| Gross Living Area | 4,018 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.0 |
| Location | A;Porter Ranch Estate; |
| View | N;Res; |
| Site | 16,432 sf |
| Quality | Q3 |
| Age | 16 |
| | **MLS PHOTO** |



### Comparable 2

20137 Via Medici

| | |
|---|---|
| Prox. to Subject | 0.32 miles E |
| Sale Price | 1,285,000 |
| Gross Living Area | 4,721 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | N;Renaissance; |
| View | N;Res; |
| Site | 11,478 sf |
| Quality | Q3 |
| Age | 14 |



### Comparable 3

20239 Via Madrigal

| | |
|---|---|
| Prox. to Subject | 0.20 miles E |
| Sale Price | 1,485,000 |
| Gross Living Area | 5,210 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.0 |
| Location | N;Renaissance; |
| View | N;Res; |
| Site | 11,364 sf |
| Quality | Q3 |
| Age | 4 |

**EXHIBIT C**

## Comparable Photo Page

| | |
|---|---|
| Borrower | NA |
| Property Address | 20358 Via Sansovino |
| City | Northridge |
| County | Los Angeles |
| State | CA |
| Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP |



### Comparable 4

20274 Via Medici

| | |
|---|---|
| Prox. to Subject | 0.21 miles SE |
| Sale Price | 1,338,000 |
| Gross Living Area | 4,706 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.0 |
| Location | N;Renaissance; |
| View | B;CtySky;Mtn |
| Site | 11,015 sf |
| Quality | Q3 |
| Age | 12 |



### Comparable 5

20253 Via Galileo

| | |
|---|---|
| Prox. to Subject | 0.15 miles SE |
| Sale Price | 1,300,000 |
| Gross Living Area | 4,721 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 6.0 |
| Location | N;Renaissance; |
| View | N;Res; |
| Site | 12,117 sf |
| Quality | Q3 |
| Age | 11 |



### Comparable 6

20365 Via Galileo

| | |
|---|---|
| Prox. to Subject | 0.03 miles S |
| Sale Price | 1,184,000 |
| Gross Living Area | 3,948 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.0 |
| Location | N;Renaissance; |
| View | N;Res; |
| Site | 15,259 sf |
| Quality | Q3 |
| Age | 10 |

**EXHIBIT C**

# APPRAISER'S LICENSE

| | |
|---|---|
| Borrower | NA |
| Property Address | 20358 Via Sansovino |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP |

**EXHIBIT C**

**Aerial Map**

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |

1/7/14                                             RealQuest.com® - Report

### Street Map Plus Report
For Property Located At



## 20358 VIA SANSOVINO, NORTHRIDGE, CA 91326-4409



pro.realquest.com/jsp/report.jsp?&client=&action=confirm&type=getreport&recordno=0&reportoptions=8e6e5d49-0895-4fb9-9bbb-4ae07abb9ec9&frclcrt=false...    1/1

### EXHIBIT C

**Plat Map**

| Borrower | NA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |



**EXHIBIT C**

# Building Sketch (Page – 1)

| Borrower | NA | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | |



TOTAL Sketch by a la mode, inc.

**Area Calculations Summary**

| Living Area | | |
|---|---|---|
| First Floor | | 2729.12 Sq ft |
| Second Floor | | 2755.12 Sq ft |
| Staircase | | -276.02 Sq ft |
| **Total Living Area (Rounded):** | | **5208 Sq ft** |
| Non-living Area | | |
| 3 Car Attached | | 556.13 Sq ft |
| Open to Below | | 304.15 Sq ft |

Form SKT.BLDSKI – "TOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE

**EXHIBIT C**

File No.    130594

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

**C1**

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

**C2**

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

**C3**

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

**C4**

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

**C5**

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

**C6**

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.


Quality Ratings and Definitions

**Q1**

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

**Q2**

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Form UADDEFINE1 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C** 

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

**Q3**

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

**Q4**

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

**Q5**

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

**Q6**

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

**EXHIBIT C**



# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| BsyRd | Busy Road | Location |
| o | Other | Basement & Finished Rooms Below Grade |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| Woods | Woods View | View |

Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Form UADDEFINE1 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**EXHIBIT C**



# Building Sketch (Page - 2)

| Borrower | NA | | | | |
|---|---|---|---|---|---|
| Property Address | 20358 Via Sansovino | | | | |
| City | Northridge | County Los Angeles | State CA | Zip Code 91326 |
| Lender/Client | Pite Duncan, LLP | | | | |

| Living Area | | Calculation Details | | |
|---|---|---|---|---|
| First Floor | 2729.12 Sq ft | 38 × 29.25 | = | 1111.5 |
| | | 15.25 × 11.5 | = | 175.38 |
| | | 27 × 45.75 | = | 1235.25 |
| | | 19.25 × 10.25 | = | 197.31 |
| | | Arc | = | 9.69 |
| Second Floor | 2755.12 Sq ft | 19.75 × 10 | = | 197.5 |
| | | 15.25 × 7 | = | 106.75 |
| | | 60.5 × 32 | = | 1936 |
| | | 11 × 13.75 | = | 151.25 |
| | | 16 × 19.5 | = | 312 |
| | | 0.5 × 16 × 0.25 | = | 2 |
| | | 10.2 × 9.25 | = | 94.35 |
| | | Negative Arc | = | 44.73 |
| Staircase | -276.02 Sq ft | 10.2 × 10 | = | 102 |
| | | 16 × 8.25 | = | 132 |
| | | 0.5 × 16 × 0.25 | = | 2 |
| | | Arc | = | 37.55 |
| | | Arc | = | 2.47 |
| **Total Living Area (Rounded):** | **5208 Sq ft** | | | |
| **Non-living Area** | | | | |
| 3 Car Attached | 556.13 Sq ft | 19.5 × 19.75 | = | 385.12 |
| | | 18 × 9.5 | = | 171 |
| Open to Below | 304.15 Sq ft | 19.25 × 15.8 | = | 304.15 |

**EXHIBIT C**

## Location Map

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower | NA | | | | | | |
| Property Address | 20358 Via Sansovino | | | | | | |
| City | Northridge | County | Los Angeles | State | CA | Zip Code | 91326 |
| Lender/Client | Pite Duncan, LLP | | | | | | |



**EXHIBIT C**